## Kennedy's Estate.

Argued October 16, 1935.  Before Frazer, C. J., Kephart, Schaffer, Maxey, Drew, Linn and Barnes, JJ.

*John M. Freeman,* of *Watson & Freeman,* with him *H. F. Stambaugh* and *Ralph H. Demmler,* for appellants.

*Charles F. C. Arensberg,* of *Patterson, Crawford, Arensberg & Dunn,* for appellees.

OPINION BY MR. JUSTICE BARNES, March 23, 1936:

On March 19, 1918, Julian Kennedy, a construction engineer of Pittsburgh, entered into a written agreement* with his two sons, Joseph W. Kennedy and Julian Kennedy, Jr., in connection with the business in which the three were engaged. This agreement continued in force for a period of more than fourteen years from its date, until terminated by the father's death on May 28, 1932. Thereupon the sons filed a claim against his estate in the amount of $185,874.83, of which $129,503.83 represented a reimbursement for losses incurred by the business, which losses had been charged against them on the books of the concern, and $56,371 represented interest on profits allocated to them, which had remained in the business.

---

* This Memorandum of Agreement between Julian Kennedy, Sr., Joseph W. Kennedy and Julian Kennedy, Jr., witnesses that the partnership existing between these parties in the year 1917 is to be continued on the same terms as heretofore, namely, the business is to be conducted under the name of Julian Kennedy, Engineer; Joseph W. Kennedy is to receive a salary of Seventy-five Hundred Dollars ($7500.00) per year, and Julian Kennedy, Jr., a salary of Six Thousand Dollars ($6000.00) per year, chargeable to the expenses of the business; each of the three parties is to receive one-third of the profits of the business; the title to the business, the good will and other assets are to be retained by Julian Kennedy, Senior, the interest of the other partners extending only to their share of the profits earned during the life of the partnership.

This partnership may be terminated on ninety (90) days written notice by any of the partners.

In passing upon the validity of these claims the following facts appearing in the record are pertinent.

The agreement between the parties provides in substance, that the business should be conducted under the name of "Julian Kennedy, Engineer"; that Joseph W. Kennedy and Julian Kennedy, Jr., should receive stipulated annual salaries; that each of the three parties should receive one-third of the profits; that the title to the business, the good will and other assets, should be retained by Julian Kennedy, Sr., the interest of the sons extending only to their share of the profits earned; and that any of the parties might terminate the agreement upon ninety days' written notice.

In the agreement, which was prepared by Julian Kennedy, Sr., and signed by him and his two sons, the term "partnership" was continually used. Only one copy thereof was made, and it was placed in a lock box in the father's safe, the key to which was in the custody of the bookkeeper. The sons did not see this agreement again until after their father's death; the bookkeeper testified, however, that as far as she knew, neither of them had requested to see it.

After the execution of the agreement, the business continued to be conducted as before, solely in the name of Julian Kennedy, Engineer, and under his direction. The funds of the business were kept in his personal bank account, mingled with his private funds. The son, Joseph W. Kennedy, by virtue of a power of attorney from his father, had access to this bank account. Both sons were active in the management and conduct of the business.

Profits were earned each year from 1918 to the end of 1926; at the end of each calendar year the books were closed, the profits so ascertained were equally divided, and one-third thereof credited to the account of each of the three parties. The share of the profits due the sons was not always withdrawn at the end of each year, but a portion thereof was permitted to remain in the business.

At the end of the year 1926 the amount of such profits owing to each son was $48,287. For the five years from 1927 to 1931, inclusive, losses were sustained each year, which, in like manner as the profits, were equally divided at the close of the year, and one-third thereof was charged to the account of each of the three parties. The total losses so charged to each of the sons, for the period mentioned, amounted to $64,751.91. So far as the record shows there was no objection or protest made by the sons, during the five-year period last mentioned, to the charges made against them on the books, of their share of the losses; in fact, they claimed they were not familiar with the books of the business, and did not know that losses were charged against them.

Notwithstanding such contention, it is admitted of record that "Joseph W. Kennedy and Julian Kennedy, Jr., each included in their personal income tax returns as a deduction one-third of the losses of the business carried in the name of Julian Kennedy, Engineer, for the years 1927 to 1931." They maintained that they merely adopted the figures given to them by the auditor of the business, in making out their respective income tax returns. The informative return made of the business, as required by the Federal Income Tax Laws, reported that the losses were distributed one-third to each of the parties, as the same appeared on the books. Some of the tax returns of the business during this period, showing allocation of losses, were signed and sworn to by the son, Joseph W. Kennedy. The personal income tax return of the father for the same years showed a deduction from his income for *only* one-third of the losses.

Julian Kennedy, Sr., left a will dated January 20, 1923, by which he directed his estate to be divided equally among his wife, Jennie E. Kennedy, his two sons, above mentioned, and two daughters, Lucy Kennedy Miller and Eliza Kennedy Smith. As his wife had predeceased him, his entire estate was distributable to his four children. The will was duly probated and letters

testamentary were issued to his children, above named, who were designated executors under the will.

Upon the death of the father the sons took possession of all the books, records and papers of the business, including the copy of their agreement of March 19, 1918. After consultation with counsel, to whom they submitted the agreement, they were advised that it did not create a partnership with their father, but merely a profit-sharing arrangement under which they were not liable for losses incurred by the business. Accordingly, the sons instructed their accountant to make entries in closing the books as of the date of their father's death, charging back to the business the share of the losses which had been apportioned to them during the preceding five years. Similar entries were made charging interest on the profits left with the business by the sons. These entries (which the daughters claim were made without notice to them) were self-explanatory, and clearly showed that they had been made after the death of Julian Kennedy, Sr. The entries so made consisted of charges against the account of Julian Kennedy, Sr., of two-thirds of the losses ($129,503.83), which had been charged to the two sons during their father's lifetime, and also of charges against the father's account of interest in the amount of $56,371, on all the profits of the sons which had remained in the business.

The decedent's own personal books were likewise changed after his death to make it appear that he was liable *for all the losses,* and for the interest item claimed. The net result of these "adjustments" on the books disclosed that the decedent's estate was indebted to the sons in the amount of $185,874.83, each son claiming, as stated above, that he was a creditor of his father's estate to the extent of one-half of said amount.

As executors, the sons and daughters could not agree upon a firm of accountants to audit the books of the decedent, including those of the business. As a result of this dispute, the daughters obtained a court order, in

obedience to which the books were delivered to their accountants, who reported the above entries to their clients. Both sets of executors filed accounts, that of the sons being in accord with the final entries made by their accountant, while that filed by the daughters made no allowance for these claims. At the audit of these accounts, the auditing judge rejected both claims of the sons. Certain other questions in dispute were decided in their favor. Exceptions to this adjudication were overruled by the court in banc. From the decree disallowing their claim for repayment of the losses, the sons have taken this appeal; no point is raised either in the assignments of error or in the statement of questions involved as to the disallowance of their claim for $56,371, representing interest on the profits which they left in the business.

The question whether the agreement of 1918 created a partnership, or whether the sons were merely profit-sharing employees of their father, has been given exhaustive study by counsel for the respective parties, and careful consideration by this court. It is earnestly contended on behalf of appellants that the agreement lacked the essential elements of a partnership as prescribed by the Uniform Partnership Act of March 26, 1915, P. L. 18, particularly, since under the arrangement, there was no co-ownership of partnership property or business. Appellees urge that where a written agreement is entered into expressly designating the relationship of the parties as partners, and for fourteen years the business is carried on as a partnership, the parties sharing profits and losses equally, that a partnership in fact did exist.

It seems to us that no purpose would be served by a discussion of these opposing viewpoints, and the authorities cited in their support. There are other factors in the case of more important bearing in determining whether these claims should be allowed against the estate, than the technical question whether or not a partnership was constituted under the agreement. We share

the view of the court below that "a finding that the agreement did or did not constitute a statutory partnership is immaterial."

The real inquiry here is whether it was obligatory on the part of the sons to have raised the question of their liability for the share of the losses within a reasonable time after losses were first assessed against them; whether they waited too long before asserting their claims, so that they are now precluded from denying the entries contained in their books, and their acts and determinations in respect thereof. Appellants assert, however, that they were not familiar with the books of account of their own business, and had no knowledge of the particular entries therein prorating the losses equally among the three parties in interest. As the result of a careful examination of the record, we are convinced that they possessed such knowledge. The allocation of losses aggregating thousands of dollars each year for the five-year period from 1927 to 1931 could not have been made without any inquiry or notice on their part as principals with their father actively engaged in the operation and management of the business. They cannot evade all knowledge of these entries or escape liability therefor, by placing responsibility for them upon their bookkeeper, and the accountant, who annually audited and closed the books. It is not sufficient to say that such entries were unauthorized, or that they were a mistake. It was the obligation of appellants to know what their books and records contained.

The fact that they adopted the so-called mistake and made it their own in the preparation of their income tax returns to the federal government, makes it more difficult to accept their explanation. In other words, at the close of the year 1927, when losses were first incurred, the books were audited and closed by the accountant, and one-third of the losses were charged to each of the parties. This fact must have been known to the sons, because each of them was afforded information which en-

abled him to include one-third of the losses of Julian Kennedy, Engineer, as a deductible item for the year 1927 in his federal income tax return. The same procedure was followed for the four succeeding years. This evidence cannot be ignored or controverted. It shows that the two sons not only were cognizant of the proportionate sharing of losses, but that they acquiesced in this method of dividing them. Had there been any objection thereto the question would have arisen during the lifetime of Julian Kennedy, Sr., when the losses were first incurred in the business. The right to terminate the agreement inured to the benefit of each party under its terms, and anyone dissatisfied with the arrangement could have withdrawn at the time. However, we believe that the parties to this agreement, men of intelligence and business experience, clearly intended that losses should be equally divided among them.

The time to have raised the question now before us was during the lifetime of Julian Kennedy, Sr., not after his death. Having acted for a period of years upon the understanding that they were chargeable with a share of the losses, the sons are now estopped from obtaining from the estate of their father reimbursement for losses which they assumed and paid voluntarily during his lifetime. The applicable principle of law was stated by Mr. Justice POTTER, speaking for this court, in *Phila. & R. C. & I. Co. v. Schmidt*, 254 Pa. 351, 357: "An estoppel may be raised by acquiescence, where a party aware of his own rights, sees the other party acting upon a mistaken notion of his rights. 'The rule is well recognized that when a party with full knowledge, or with sufficient notice or means of knowledge of his rights and of all the material facts, remains inactive for a considerable time or abstains from impeaching the transaction, so that the other party is induced to suppose that it is recognized, this is acquiescence, and the transaction, although originally impeachable, becomes unimpeachable.'" In *Wagoner v. Phila.*, 215 Pa. 379, 382, it was stated by

this court: "It would be most unreasonable to permit an employee to receive his pay without objection or dissent, from time to time at a fixed rate, for a considerable period, and thereafter present a claim for additional compensation. If the amount received was not satisfactory the employees should have quit work, or raised an objection then and there; so that the department would have been put upon notice, and would have exercised its option of meeting the demand, or finding someone else to do the work for the rate of pay deemed sufficient. We can only look upon the continuance in employment, as an expression of satisfaction by the workmen with the amount of the compensation; and the receipt of payments every two weeks throughout the whole period, is to be deemed an estoppel against the assertion of any claim for additional compensation at this time. Under the circumstances, continuance in the employment of the department from day to day can only be regarded as acquiescence in the rate of wages fixed by the department." See also *Redmond v. Saving Fund,* 194 Pa. 643; *Marshal v. Foltz,* 221 Pa. 570.

Even if it be conceded that appellants made no protests against the charges, because they were mistaken as to their rights under the terms of the agreement, they are then in no better position. It is apparent that to the extent that the losses were assumed by them, it was in relief of their father, upon whom, otherwise, the entire burden of the losses would have fallen. Their mistake, if any mistake existed, concerned the legal construction of the agreement under which they were operating. This was a mistake of law, and it is a firmly-settled rule, founded on sound wisdom and policy *(Good v. Herr,* 7 W. & S. 253), that one who has voluntarily paid money with full knowledge, or means of knowledge of all the facts, without any fraud having been practiced upon him (and there is here no claim of fraud) cannot recover it back by reason of the payment having been made under a mistake or error as to the applicable rules of law:

234

*Clark v. Lehigh and Wilkes-Barre Coal Co.,* 250 Pa. 304; *Bobst v. Gring,* 32 Pa. Superior Ct. 541; *Johnson v. Hernig,* 53 Pa. Superior Ct. 179; see also *Miners & Merchants Bank of Nanty-Glo Case,* 313 Pa. 118, and cases there cited.

In the view which we have taken of the case it is unnecessary to discuss the other questions argued by counsel.

Decree affirmed, costs to be paid by appellants.