William Sellers & Co., Inc., Appellant, *v.* Clarke-Harrison, Inc., et al., Appellants.

Argued January 7, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON and STEARNE, JJ.

reargument refused May 28, 1946.

*Morris Wolf,* with him *Wolf, Block, Schorr & Solis-Cohen,* for plaintiff.

*Charles J. Biddle,* with him *Leslie M. Swope, Edmund C. Wingerd* and *Wingerd & Long,* for defendants.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, April 17, 1946:

This is an action in equity for an accounting and for the declaration of a constructive trust. It was begun by William Sellers and Company (hereinafter called Sellers) against Clarke-Harrison, Incorporated, Chambersburg Engineering Company (hereinafter called Chambersburg) and Eugene C. Clarke, president of the latter companies. The complaints were (1) to recover an alleged overpayment to Clarke-Harrison of management fees and (2) for an accounting of profits made by Chambersburg from a navy contract which it was alleged Clarke had improperly diverted from Sellers to Chambersburg. The court below denied plaintiff's right to recover any part of the management fees, but a majority of the court required the defendants to account for the profits from the alleged diverted contract. One judge dissented. These appeals followed.

We have carefully studied this voluminous record. The facts themselves are not in dispute. The decision of the court is based upon inferences and the legal conclusions made from the proven facts.

Sellers, a closely held family corporation, has for many years been engaged in the City of Philadelphia in the manufacture and sale of machine tools. In June, 1938, it found itself in serious financial difficulties. It had lost $1,567,000 during the previous ten years. The officers and stockholders were alarmed and were seeking sale and liquidation of the corporation. They contemplated the possibility of bankruptcy or reorganization under 77 B of the Bankruptcy Act. The corporation was indebted to the Philadelphia National Bank in the sum of $600,000. The Pennsylvania Company for Insurances on Lives and Granting Annuities was the trustee of the estate of a large stockholder and in its banking depart-

ment was the holder of certain shares of the corporation held as collateral for loans. The two bank creditors, fearful of the soundness of their loans, suggested to Sellers that it employ Clarke-Harrison, a corporation engaged in the management of businesses, to manage and supervise the business of the corporation. The board of directors of Sellers was composed of highly successful and well-known business men. They unanimously agreed to such employment and their action was approved at a meeting of the stockholders. The attorney for Sellers revised and approved the contract of employment which was submitted to Sellers. The executed contract of employment was dated June 24, 1938 (and amended twice thereafter). It was in operation until February, 1943, when it was cancelled. During the period of the Clarke-Harrison management the business became highly successful. It ceased to be operated at a loss and produced enormous profits. Sellers was lifted out of the red and placed in the black. It was able to add over one million dollars to its surplus. On February 2, 1943, through negotiations by one of the Sellers' directors all of the stock of Sellers was sold to the Srell Corporation. Sellers had been financially rehabilitated and sold to good advantage. Clarke-Harrison had received substantial compensation for the successful results which were obtained during its management. Apparently the business relations of Sellers and Clarke and his companies had terminated to the mutual satisfaction of all the parties.

Prior to the purchase by Srell it had sent five or six accountants to Sellers to examine and go over all of Sellers' books and accounts, which examination commenced December 17, 1942, and consumed six to nine days and nights thereafter. The sale of the shares of stock was consummated on February 2, 1943. Upon the sale all officers and directors of Sellers resigned and were replaced by individuals chosen by the new owners. On February 5, 1943, Sellers, acting by its new owners, paid to Clarke-Harrison $215,000 on account of its compensa-

tion for 1942, and on May 14, 1943, $3,982.98 in payment of the balance of the fee. On April 1, 1943, and June 4, 1943, Sellers paid Chambersburg $45,923 and $8,915.47 on account of Chambersburg compensation under the facilities contract hereinafter referred to.

On May 1, 1943, Mr. William H. Harman became president of Sellers. In planning for future business of the corporation, Mr. Harman had his attention drawn to the method of calculating the Clarke-Harrison fee and the facts connected with the facilities contract entered into by the United States Government with Chambersburg. As a consequence this suit was commenced on January 7, 1944.

As to the management contract: Clarke-Harrison's fee was $2,000 monthly in cash, plus at the end of each fiscal year of Sellers (about) *one-third of the net operating income.* The contract also defines net operating income in these words: "Net operating income shall be after the fee to Clarke and any interest paid on liabilities but before income from investments, profit or loss on sale of investments or other capital assets or carrying charges on unused real estate."

This original contract was twice amended, reducing the Clarke-Harrison percentage of the net operating income, but did not otherwise affect the method of calculation of the fee. The calculation was made and fee paid during the whole time of the contract and its amendments by deducting from the gross operating income the operating expenses, including salary of officers, fixed compensation to Clarke-Harrison on the per-month basis, and from the remaining profit before federal and state income taxes, there was deducted six per cent on the actual value of the capital payable to the stockholders and of the remaining operating profit one-third (or the later reduced percentages) to Clarke-Harrison, Incorporated, and the remainder to the stockholders.

Sellers, acting by its new owners of the stock, contends that this was an erroneous calculation. That from

the net income, after the above deductions, there should first have been deducted the one-third share due Clarke-Harrison and that *after* such deduction Clarke-Harrison was only entitled to one-third of the balance. If this was correct there would have been an overpayment to Clarke-Harrison of $78,760.11 which Sellers demanded should be repaid to it.

We agree with the court below that this contention is without merit. Before the purchase of the Sellers' stock the accountants for the Srell company brought this situation to the attention of the officers of Sellers and also to the attention of Srell. The method of calculation and payments were also disclosed before such purchase in the last audit and report of Mathieson-Aitken and Company, Sellers' accountants. With such full knowledge and disclosure before them, the new officers so fully informed, paid to Clarke-Harrison $215,000 in payment on account of such management fees and later paid the balance of the account amounting to $3,982.98.

Plaintiff maintains that the written contract was not ambiguous and therefore the alleged overpayment is recoverable, even if the payments were made after notice of the terms of the contract and its prior construction by the parties. We are not convinced that the terms are not ambiguous. But even if the terms are regarded as unambiguous, a distinction exists between the construction of an unambiguous contract *prospectively,* based on the parties' interpretation, and the *recovery back* of money paid on an account settled by them. Money deliberately and voluntarily paid under a contract, with knowledge or means of knowledge of the material facts and without fraud or duress, even though paid under a mistake of law as to the interpretation of a contract cannot be recovered back, 48 C. J. 734, 736, 738, 755; *Millard Exr., et al., v. Delaware L. & W. R. R. Co.,* 240 Pa. 234, 87 A. 601; *Kennedy's Estate,* 321 Pa. 225, 183 A. 798. Money cannot be recovered where the payment is pursuant to a uniform practice in construing the con-

tract year after year. *Clark v. Lehigh & W. B. Coal Company,* 250 Pa. 304, 95 A. 462; *Birdsall-Friedman Company v. Globe and Rutgers Insurance Company,* 326 Pa. 404, 190 A. 924; similarly where there has been an account stated, 1 C. J. S. 731; *Thompson v. Fisher,* 13 Pa. 310; *Donahue v. Philadelphia,* 157 Pa. Superior Ct. 124, 128, 41 A. 2d 879. Appellant relies upon *Tustin v. Philadelphia & Reading Coal & Iron Company,* 250 Pa. 425, 95 A. 595, and *Northern Liberties Gas Company v. United Gas Improvement Company,* 348 Pa. 433, 35 A. 2d 284. Neither of these cases applies, because this contract is ambiguous, but even if it were not, the two cases cited relate to *prospective operation* of contracts and not to the *recovery back* of voluntary payments under a mutual interpretation thereof.

As to accounting of profits from the contract alleged to have been improperly diverted by Clarke from Sellers to Chambersburg:

In 1940 Sellers, through Clarke, was presented with an opportunity to obtain a contract with the United States Navy for 120 horizontal boring mills at a price in excess of $3,000,000. It was regarded as a highly profitable and desirable contract. Delivery was required to be made within a limited time. A boring mill machine consists of over 2,000 small parts, assembled and erected upon a heavy cast iron bed and components which must be machined prior to assembly. Sellers never had facilities to cast the bed and components, and consequently, for years prior to 1938 had secured them from Chambersburg. In 1940, because of the large order in prospect, and in view of other orders secured by Clarke approximating $5,000,000, Sellers did not have the facilities to machine the heavy castings and components theretofore secured from Chambersburg. In order to obtain the desired contract (hereafter called the *supply* contract) it became necessary to erect additional *facilities* consisting of a machine shop containing particular tools necessary for the machining of the heavy castings, and

additional assembly space. Through appropriate Acts of Congress the United States Government undertook to finance the erection and equipment of facilities required by manufacturers to fulfill their supply contracts with the government. The manufacturers borrowed the requisite funds from a bank, and the government paid back to the bank twenty percent each year for five years until the loan was liquidated. Title to the facilities remained in the government, and at the conclusion of the *supplies* contract, or its cancellation, the manufacturer had the privilege of purchasing back the facilities at their *then* value (the government absorbing any loss in depreciation, etc.) or leasing the same from the government. In order to finance the construction of "facilities" required the expenditure of over $600,000, which Sellers did not have, and which would have to be borrowed.

Clarke and Sellers were desirous of securing the large and profitable supply contract and were willing to enter into the facilities contract in order to qualify to obtain it. The business problem arose as to how to handle the matter. Before the securing of so vast an order Sellers had purchased the large castings from Chambersburg and machined them in Philadelphia in its own shops. The weight of a casting was heavy, being over eighty per cent of the weight of the entire machine. Shipping between Chambersburg and Philadelphia, and transportation costs, the element of time and other difficulties entered into the consideration of the problem. It was concluded that it would be more economical and expedient to machine the castings and assemble the machines in Chambersburg. During October, 1940, the plans of the parties changed from day to day depending upon what plan appeared most expeditious. If the facilities contract was taken by Sellers, it would mean an increase of indebtedness of about $750,000 and the possibility of financial complication which might interfere with the sale of the stock in liquidation which Sellers desired. On the other hand, such a facilities contract

might prove to be advantageous and profitable to Sellers. The alternative was to permit Chambersburg to machine and assemble the machines, and for them to take over the facilities contract with its attendant profit or risk.

On October 4, 1940, it was concluded, and the government was so notified, that Sellers would form a subsidiary corporation which would lease land from Chambersburg adjacent to the Chambersburg foundry and would machine the castings and assemble the machines and Sellers, or its subsidiary, would therefore enter into the facilities contract.

On October 10, 1940, the government was informed that Chambersburg would machine the castings and would assemble the machines, and on October 14, Sellers and Chambersburg jointly wrote the government that the facilities would be undertaken by Chambersburg and the contract made by it. On October 16, 1940, this arrangement was approved by the Sellers directors. On October 24, 1940, Mr. Spahr, attorney for Sellers, and Mr. Sellers, chairman of the board, suggested that it might be advantageous for Sellers to build the facilities on the ground leased from Chambersburg. On the following day, October 25, 1940, the board met and authorized Sellers to take the facilities contract and to borrow $750,000 to finance same.

Clarke agreed to the change. On October 29, 1940, Clarke, Benzon who was president of Sellers, Mr. Thompson, attorney for Sellers, and Mr. Holljes, sales manager for Sellers, met in Washington and went to the Navy Department for the purpose of substituting Sellers for Chambersburg as the facilities contractor. They met representatives of the government and discussed the matter. The parties were informed that the Navy would not approve the substitutions as the department required that the facilities be erected on land to be owned by the contractor in fee.

On return from Washington the matter was reported to the board of directors who authorized the change

back to the original plan of October 14, 1940. Contracts were thereupon drawn by the respective counsel: 1.—Contract of Supplies between Sellers and the government; 2.—Contract between Sellers and Chambersburg as to machinery and assembling machines; 3.—Contract between Chambersburg and the government as to erection of facilities. They were executed on November 27, 1940. On February 17, 1941, the stockholders, at its meeting, ratified and approved the action of the officers and directors.

The chancellor, Judge Gordon, upon the foregoing facts, decreed that the facilities contract between the government of the United States and Chambersburg was wrongfully secured by Clarke in breach of his fiduciary duty to obtain the same for Sellers. The chancellor was of opinion that the ratification by the officers, directors and stockholders of Sellers was a mere form and subterfuge. He was of opinion that the execution of the management contract by the officers and directors of Sellers, approved by the stockholders, completely surrendered the authority, responsibilities and duties of the officers and directors of Sellers to Clarke-Harrison and that thereafter Eugene Clarke, the president of Clarke-Harrison, assumed all of the duties and responsibilities of the Sellers regular corporate directors and officers. He found as a fact that Clarke was in such controlling and dominating position in Sellers, Clarke-Harrison and Chambersburg as to make possible the diversion of the contract to Chambersburg and which amounted to a fraudulent betrayal of Sellers' interest by Clarke—its fiduciary. He also found as a fact that it was Clarke's secret and undisclosed purpose to divert the contract to Chambersburg so that Clarke and his associates might profit thereby at the expense of Sellers. Judge Lewis filed a dissenting opinion. According to his view the findings of the chancellor were not supported by the evidence; the court should not compel a satisfied employer to be dissatisfied; the directors and stockholders

ratified everything that was done and the assignee of the corporate stock subsequently sold by the ratifying holders, should not through the corporation be permitted to raise this question.

The evidence is really undisputed. It consists largely of documents such as contracts, records of corporate minutes, reports, etc. The oral testimony is not disputed. The learned chancellor disbelieved Clarke on certain questions. Most of the controlling findings are the result of deductions or inferences from the facts not in substantial dispute. In *Blue Ridge Metal M. Co. v. N. Pa. P. Co.*, 327 Pa. 424, 194 A. 559, it was said (p. 432): "While the findings of fact of a chancellor, supported by competent evidence, and affirmed by the court in banc, are conclusive upon appeal: Belmont v. Heist, 300 Pa. 542; Clark's Est., 303 Pa. 538; Brinton v. Davidson, 308 Pa. 371, such rule does not apply in favor of the deductions or inferences which are made by the chancellor from the facts which he has found. The conclusions of the chancellor being no more than his reasoning from the facts, are always reviewable upon appeal: Hamilton v. Fay, 283 Pa. 175; Lineaweaver's Est., 284 Pa. 384; Dorrance's Est., 309 Pa. 151." See also: *Hindman's Appeal*, 85 Pa. 466; *Crick v. Paull et al.*, 287 Pa. 431, 135 A. 103; *Fidelity-Phila. Tr. Co., Ex., v. Lehigh Valley Coal Co.*, 294 Pa. 47, 143 A. 474; *Lawrence v. King*, 299 Pa. 568, 150 A. 169; *Custis v. Serrill et al.*, 321 Pa. 154, 183 A. 774; *Potter et al. v. Brown et al.*, 328 Pa. 554, 195 A. 901; *Estate of Frank A. Boswell, Deceased*, 109 Pa. Superior Ct. 365, 167 A. 402; *Easton v. Koch et al.*, 152 Pa. Superior Ct. 327, 31 A. 2d 747.

It was error for the court below to so construe the management contract, and its supplements, as superseding all the powers and duties of the Sellers' officers and directors. The board of directors remained as before the execution of the contract, and was composed of high grade and well known business men. This contract did not surrender the power and duties of Sellers' directors

and delegate them to Clarke-Harrison. All it purported to do, and in fact did, was to constitute Clarke-Harrison *business manager* for Sellers. We do not agree that Clarke-Harrison was endowed with the equivalent of the powers and authority of the officers and directors of Sellers. The decisions concerning corporate policy were duly submitted to the Sellers board of directors *before* they became effective, and in all cases were thereafter approved at stockholders' meetings. See *Cowell v. McMillin et al.,* 177 Fed. 25, 36, 38; *Stoneman v. Fox Film Corporation,* 295 Mass. 419, 4 N. E. (2d) 63, 66; 2 Fletcher, Cyclopedia of the Law of Private Corporations, p. 377.

We are convinced that it has not been proven that Clarke-Harrison did any wrong to Sellers or perpetrated any fraud whatsoever. The Clarke-Harrison employment was not solicited by that corporation. It was suggested by the two large creditors of Sellers. Everybody knew that Mr. Clarke was president and large stockholder in both Clarke-Harrison and Chambersburg. Such fact was never concealed, but was always revealed and was well known. Sellers' board of directors and the stockholders, with this full information and knowledge, authorized the contract. With the creation of such dual responsibility by the interested parties with full notice all that was required of Clarke-Harrison was to perform its duties with honesty and fidelity. It has not been proven Eugene Clarke did not act in good faith. When the Navy official notified Mr. Clarke, Mr. Benzon, the president of Sellers, and Mr. Thompson, Sellers' attorney, and its sales manager, Mr. Holljes, that the Navy would not enter into the facilities contract with Sellers for the assigned reason, this was reported to Sellers' board of directors who thereafter authorized the contract with Chambersburg. Sellers' attorney assisted in the preparation of the contracts and the Sellers officers were authorized and did thereafter execute them. All of this was later approved at a stockholders' meeting. It is

futile to say, under this record, that the action of Sellers' board of directors and of its stockholders was a mere formality on the theory of Clarke-Harrison's domination over them. There is not a line of testimony that Mr. Clarke so dominated them. Any conclusion that it was Clarke's secret and undisclosed intention to secure the facilities contract for his own profit, is a matter of conjecture and suspicion, which never take the place of testimony: *Rosenthal's Estate,* 339 Pa. 488, 496, 15 A. 2d 370; *Ash Will,* 351 Pa. 317, 324, 41 A. 2d 620. The learned chancellor rested largely upon *Bailey et al. v. Jacobs,* 325 Pa. 187, 189 A. 320. We agree with the principles of that case. However, such principles do not apply to the present facts. In that case the defendant manager illegally withdrew corporate funds for his individual use; by gross manipulations and deliberate concealment and falsification induced innocent stockholders, without notice, to agree to a merger with his own worthless corporation, and made a personal secret profit. To accomplish his fraudulent purposes he caused his own nominees to be elected as officers and directors. That was an entirely different situation than here exists.

On the facts of the present case it is clear that plaintiff has not shown the fraud alleged in the bill as the basis of equitable relief and that the bill should have been dismissed.

We therefore need not consider Mr. Eugene Clarke's personal liability in this action or the failure to make the United States government a party to this litigation.

Appeal No. 185 is dismissed and the decree affirmed at appellant's cost. Appeals 187, 188 and 189 are sustained; the decree of the court below is reversed, and it is ordered that the bill be dismissed. Appellees to pay the costs.