Philadelphia Transportation Company *v.* Philadelphia Suburban Transportation Company (et al., Appellant).

Argued April 20, 1955. Before STERN, C. J., STEARNE, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Francis Hopkinson,* with him *W. Belskin Ginsburg,* for appellant.

*M. Carton Dittmann, Jr.,* with him *Peter Platten, Hamilton C. Connor, Jr.,* and *Ballard, Spahr, Andrews & Ingersoll,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, June 27, 1955:

The appeal is from a decree in equity enjoining a tenant in a transportation terminal from conducting a store for the retail sale of women's hosiery. The court found that the conduct of such business constituted *"undue competition"* with a retail women's hosiery merchant in an adjoining transportation terminal in violation of a provision in a written agreement.

The salient facts are largely undisputed and are thus stated by the Chancellor in his adjudication: "Predecessors of plaintiff, Philadelphia Transportation Company, in 1905 and 1917, leased land at 69th Street to predecessors of defendant, Philadelphia Suburban Transportation Company. In 1935 an agreement was entered into between the parties giving the predecessors of defendant Suburban the opportunity to reconstruct their terminal on land adjacent to plaintiff's terminal at 69th Street. In this agreement predecessors of defendant Suburban were limited to using for commercial purposes 25% of the total area leased under the 1905 and 1917 leases and this was also limited to commercial enterprises that are not unduly competitive with lessees in plaintiff's terminal. In April, 1953, defendant Suburban let space in its 69th Street Terminal to defendant Gay Hosiery for the sale of women's apparel, including women's hosiery. Plaintiff Transportation Company, upon learning of this event, notified defendant Suburban that its action violated their 1935 agreement in that defendant was using for commercial purposes more than 25% of the total area covered by the 1905 and 1917 leases, and that de-

fendant Gay Hosiery would be unduly competitive with a lessee in plaintiff's adjoining terminal. Plaintiff brought the present complaint in equity to enjoin the action of defendants."

The Philadelphia Transportation Company, as indicated, leased space in its terminal to Carmine C. Bonanni for the sale of women's hosiery. He also sold women's aprons and bobby socks. Bonanni is employed by a hosiery manufacturer and supervises the finishing department. For a period he also operated a hosiery concession at the Broad and Olney terminus of the Philadelphia Transportation Company.

On April 1, 1953, defendant Suburban entered into a lease with co-defendant Gay Hosiery Company (whose main store is at 711 Chestnut Street, Philadelphia) whereby it agreed to lease space in Suburban's terminal to Gay "for the sale of hosiery, underwear, blouses, skirts and sportswear". Gay opened its store for business on October 6, 1953.

The Chancellor found:

"During the month of October, 1953, defendant Gay Hosiery's gross sales at its store in the 69th Street Terminal amounted to $9,788 of which approximately $2,500 or 25% thereof were sales of women's hosiery. During the month of November 1953, defendant Gay Hosiery had total sales of $9,082, of which approximately $2,250 were sales of women's hosiery."

"In October, 1953, Bonanni's gross sales were $1,-266, a decrease of approximately 21% from his sales in October, 1952; and during the first 22 sales days of November, 1953, his gross sales were approximately $1,166, a decrease of about 18% from his sales in November, 1952."

The learned hearing Judge correctly stated in his adjudication that the *"agreement does not forbid competition; it forbids* UNDUE COMPETITION."

After quoting comparative figures respecting total sales of both Bonanni and Gay for various periods, especially in October and November, 1953, the Chancellor reached the following conclusion: "The figures evidence that until Gay Hosiery went into business Bonanni's business was prospering, despite the selling of women's hosiery by Liggett's and Schulte. However, immediately upon the commencement of business by Gay Hosiery, Bonanni's business dropped drastically. The only logical conclusion is that the competition of Gay Hosiery is in fact undue." It is upon this *conclusion* that the court below entered its decree. Where the judgment of the court below is based upon inferences or deductions from other facts, the conclusion, being the result of reasoning, is subject to review and correction by an appellate Court: *Blue Ridge Metal Manufacturing Company v. Proctor*, 327 Pa. 424, 194 A. 559; *William Sellers & Co., Inc. v. Clarke-Harrison, Inc.*, 354 Pa. 109, 46 A. 2d 497; *Brooks v. Conston*, 356 Pa. 69, 51 A. 2d 684; *Andrikanics v. Andrekanics*, 371 Pa. 222, 89 A. 2d 792.

Our examination of the evidence convinces us that the conclusion reached by the court below cannot be supported.

The court below found as a fact that at the time when plaintiff Philadelphia Transportation Company leased to Bonanni, it was known that it was leasing space to the Clover Hosiery Shop for the sale of women's hosiery. Suburban rented the space to the Clover Hosiery Shop on October 6, 1936. This shop was in continuous operation until October 14, 1950, when the lessee discontinued business on account of ill health of the proprietor. In the same terminal building two other stores, Liggett's Drug Store and Schulte Cigar, Inc., sell hosiery to which no objection is made. There was no hosiery shop in Suburban's terminal after the

Clover Hosiery Shop discontinued business until space was rented, on April 1, 1953, by Suburban to defendant Gay Hosiery Company which opened for business *October 6, 1953.*

As stated before, Philadelphia Transportation Company rented Bonanni space in its terminal on July 14, 1950. At this date the Clover Hosiery Shop, Liggett's and Schulte's were in competition with him in Suburban's adjoining terminal. Clover Hosiery continued for three months from July 14, 1950 to its discontinuance on October 14, 1950. Consequently, Bonanni *had no competition whatever* from any other *hosiery store* until Gay Hosiery opened for business on October 6, 1953.

With considerable force counsel for appellant notes in his paper book: "The Chancellor seems to have placed great reliance on the fact that Bonanni's business in November was worse than it had been in October, decreasing from $1,266 to $1,097. However, the Chancellor completely overlooked the fact that Gay's business decreased from October to November in about the same amount, percentage-wise, as Bonanni's ($2,-935 to $2,250). This confirms the fact that Bonanni's decrease cannot be blamed on competition by Gay, but was due to an adverse business cycle which affected both stores equally."

Bonanni testified, at the hearing: "A. There has been a general decline in the hosiery business for the last year and a half at least, but my decline has only started the last month."

The real reason for Mr. Bonanni's complaint is apparent. It is not that Gay Hosiery Company's competition is *undue,* but that Mr. Bonanni feels he should have no competition at all. He testified: "Q. Are you in a position to compete with Gay Hosiery? A. I don't think I am because I have solely one style and Gay

Hosiery Stores sell lingerie, they make maybe two dollars profit on it where I make thirty cents, and in order to attract business they can very well sell hosiery at four cents a pair profit or even at cost in order to get someone in to buy an article where they make three dollars on it and I cannot do that as far as price is concerned because my profit is figured on the units I sell in the hosiery line."

A consideration of the testimony convinces us that plaintiff's complaint of *undue competition* and the conclusion of the learned Chancellor to that effect, are not sufficiently supported. Competition may indeed exist, but under this evidence it cannot be restrained in equity as *undue competition.*

The decree is reversed and the complaint dismissed at the cost of appellee.