## Murphy and Slota, Appellants, *v.* Burke et al.

Argued January 11, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Bernard V. DiGiacomo,* for appellants.

*Harold W. Spencer,* with him *Wright, Spencer, Manning & Sagendorph,* for appellees.

OPINION BY MR. JUSTICE POMEROY, November 26, 1973:

The appellants, L. Francis Murphy and Robert E. Slota, are attorneys and members of the Bar of Montgomery County. They brought an action in equity against the Norristown, Pennsylvania law firm of Haws & Burke, a professional corporation, and against Thomas J. Burke, James S. Kilpatrick, Jr. and Ralph L. Hose, the three lawyers practicing in that firm. In their complaint plaintiffs recited that "for some period up until June of 1971, [they] were associated with the individual defendants in the practice of law" and that "plaintiffs are entitled to the possession of all the files, both active and closed, of the clients who have personally retained plaintiffs or either or both of them or who regard either or both of them as their own attorneys." Consequently, plaintiffs prayed, *inter alia,* that the defendants be directed to deliver all files of clients listed

in an appendix of the complaint. Defendants denied that Messrs. Murphy and Slota were associated with the firm of Haws & Burke in any capacity other than as employees. The appellants thereafter filed a companion[1] suit in which they alleged alternatively (a) that they had been *general partners* of the firms of Haws & Burke either pursuant to an express oral agreement *or* pursuant to an agreement to be implied from the conduct of the parties *or* pursuant to a partnership the existence of which the named individual defendants were estopped to deny; (b) that they had been *shareholders* in the professional corporation of Haws & Burke; or (c) that they had been *mere employees* but were entitled under an employment agreement to certain unpaid monies. In the event plaintiffs were to be found general partners or shareholders, they demanded a distribution of the assets of the firm. The two complaints were consolidated for trial.

After eight days of testimony, the chancellor[2] found that both Murphy and Slota were *employees* of Haws & Burke at all times, that they had agreed to devote their sole efforts to the affairs of that firm, and hence were entitled neither to a distribution of that corporation's

---

[1] Plaintiffs had first filed a "cross-counterclaim" to defendants' answer and counterclaim in which they set forth the allegations later made in the second complaint and which are summarized in the text above. The chancellor ordered the counterclaim stricken for noncompliance with Pa. R.C.P. 1017(a).

The defendants' counterclaim was on the theory that the plaintiffs had obtained through a mandatory preliminary injunction issued *ex parte* certain files of Haws & Burke clients, that fees were currently payable by those clients, and that plaintiffs must account for those sums. The record before us does not indicate what disposition was ultimately made of this counterclaim.

[2] The case was tried by the Honorable Carleton T. WOODRING of the Third Judicial District, specially presiding on appointment by this Court following the recusal of all judges of the Thirty-Eighth Judicial District.

assets nor to possession of its business records.[3] Extensive exceptions by plaintiffs to the chancellor's adjudication were dismissed by a unanimous court *en banc* and the two decrees denying relief were made final. This appeal followed.

Appellants urge that the decrees below must be reversed because the chancellor erred in applying the law of partnerships[4] and so wrongly decided that no part-

---

[3] The pleadings to the contrary notwithstanding, this case does not involve the question of retention by the defendant law firm of the legal files of a client against the client's wishes. As the defendant Thomas J. Burke explained: "If a client were to come to my office and ask me for his file, I would be very happy to give him his file and take it from my office, subject, however to paying our costs and expenses plus our fees for services rendered to the date of his taking the file." The appellants' claim to the files in question was shown by their evidence *not* to be based on the theory that they, as attorneys, were asserting the desires of clients. To the contrary, the claim is rather that they "own" the files by virtue of the manner in which they were associated with the firm of Haws & Burke.

[4] Appellants also contend that they were denied their right to discovery pretrial. Although the final hearing in the matter had been scheduled by agreement of the parties for October 18, 1971, plaintiffs had at that time asserted that they were not prepared to proceed because they had not yet taken the depositions of the individual defendants and certain other witnesses. A lengthy conference followed after which the court announced: "After consideration of the pleadings *and discussion* with counsel in chambers, the court directs the following: That depositions of the Plaintiffs and of the Defendants be taken today, and that depositions of the Auditor . . . shall be taken tomorrow. . . . Counsel for the Plaintiffs and Defendants *agree* that the testimony so taken shall hereafter be considered testimony of the parties in the trial of this cause. . . ." Four days were occupied by the taking of depositions before the chancellor and appellants had full opportunity to examine any and all witnesses. Defendants also made available in the courtroom the bulk of the firm's files with regard to compensation and fiscal management.

In effect appellants now argue that they did not agree to this procedure, notwithstanding that they gave all signs of having con-

nership existed. While we agree that some of the legal reasoning of the court was faulty, the findings of fact are nevertheless entirely sufficient to enable us to conclude that under correct legal principles no relief was warranted. We will therefore affirm the decrees.

## I. Partnership Implied from Conduct

A partnership is created by contract; it comes into being as do all contracts, through agreement. A contract is "a manifestation of mutual assent on the part of two or more persons." American Law Institute, Restatement (Second) of Contracts §3, at 20 (Tent. Draft No. 3, April 13, 1964). The verb "to manifest", as the word is used in the above Restatement quotation, means "to *show* plainly". Random House Dictionary of the English Language (1967). Like all contracts, partnership contracts may be either express or implied. "The distinction involves, however, no difference in legal effect, but lies merely in the mode of manifesting assent. [A]ssent may be manifested by words or other conduct, sometimes including silence . . . or by . . . other circumstances, including course of dealing or usage of trade or course of performance." Restatement (Second) of Contracts §5, at 12 (Comment).[5]

There is no requirement that partnership agreements be in writing. *Gohen v. Gravelle*, 411 Pa. 520, 192 A. 2d 414 (1963); *Pappas v. Klutinoty*, 383 Pa. 184,

---

curred in it below. Not only was no error committed, but no prejudice resulted to plaintiffs' cause arising out of the extensive opportunity to explore their opponents' case thus provided. The further hearing of the case did not take place until December 13, 1971, and plaintiffs thus had ample time in which to review the material produced.

[5] See also the comparable provision of the Uniform Commercial Code §1-201(3), 12A P.S. §1-201(3) : " 'Agreement' means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act."

118 A. 2d 202 (1955). They may be made orally or may be found to exist by implication from all attending circumstances (i.e., the manner in which the alleged partners actually conducted their business, etc.). *Gohen v. Gravelle, supra; O'Donnell v McLoughlin,* 386 Pa. 187, 125 A. 2d 370 (1956) ; *Miller v. Miller,* 370 Pa. 520, 88 A. 2d 784 (1952).[6]

As to this latter method (partnership implied from conduct), the chancellor held that a "course of conduct between the parties can only be considered as it might establish a partnership between the parties as to the claims of third persons. Such a course of conduct does not establish a partnership between themselves in the absence of an agreement, either express or implied."[7] In so concluding we are of the opinion that the chancellor fell into error. As will be seen, however, (see part III, *infra*), this limitation on partnership implied from conduct did not lead to a wrong result.

## II. Partnership by Estoppel

Appellants further contend that the appellees, by their conduct, can be held estopped to deny the existence of a partnership agreement, and that the chancellor erred in holding to the contrary. There are two strains of estoppel involved in the argument: [i] equitable estoppel, and [ii] promissory estoppel.

---

[6] See Uniform Partnership Act, March 26, 1915, P. L. 18, part II, §7, 59 P.S. §12, for statutory rules for weighing certain conduct in determining whether a partnership exists.

[7] Appellees argue that the last four words of the above quotation ("either express or implied") show that the chancellor in fact applied the correct principle, that is to say reviewed the manner in which the parties conducted the business of practicing law and concluded that no partnership agreement could be implied from that evidence. We note, however, that while the chancellor specifically stated as a conclusion of law "that there was no express oral partnership agreement", he made no corresponding conclusion with respect to an agreement implied from conduct.

[i] *Equitable Estoppel.* The principle of equitable estoppel to deny the existence of a partnership is set forth in the Uniform Partnership Act.[8] This section, as the chancellor held, is applicable by its terms only where a third party attempts to hold liable on a theory of partnership some person who has "represent[ed] himself, or consent[ed] to another [having] represented him . . . as a partner. . . ." This statutory estoppel contains all the elements of a traditional equitable estoppel: "Equitable estoppel arises when one by his acts, representations, or admissions, or by his silence when he ought to speak out, intentionally or through culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts." *Northwestern Nat'l Bank v. Commonwealth,* 345 Pa. 192, 196, 27 A. 2d 20, 23 (1942). See also American Law Institute, Restatement 2d, Agency §8B (1958).

Appellants contend, however, that this Court has applied an estoppel as between alleged partners, and not merely as between an alleged partner and a relying but misled third person. See, e.g., *Gibboney v. Derrick,* 338 Pa. 317, 12 A. 2d 111 (1940) ; *Kennedy's Estate,* 321 Pa.

---

[8] Uniform Partnership Act, pt. III, §16, 59 P.S. §38: *"Partnership by Estoppel.* (1) When a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to any one, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such representation, given credit to the actual or apparent partnership; and if he has made such representation or consented to its being made in a public manner he is liable to such person, whether the representation has or has not been made or communicated to such person so giving credit by or with the knowledge of the apparent partner making the representation or consenting to its being made."

225, 183 A. 798 (1936).[9] We think those cases correctly decided, but that upon close reading, while estoppel language was used, the cases stand for the proposition already discussed, viz., that a partnership agreement can be implied from the conduct and circumstances of the parties, that is to say, their manifestations of assent to the existence of a partnership relationship. The gist of estoppel, on the other hand, is a *mis*representation.

[ii] *Promissory Estoppel.* Appellants further argue that a partnership could be found under the theory of promissory estoppel, see Restatement 2d, Contracts §90 (Tent. Draft No. 2, April 30, 1965).[10] This doctrine, that promises will be enforced where the promisee reasonably relied and injustice can be avoided only by enforcement, is the law in Pennsylvania. See, e.g., *Fried v. Fisher*, 328 Pa. 497, 196 A. 39 (1938); *Berliner v. Bee Em Manufacturing Co.*, 383 Pa. 458, 119 A. 2d 65 (1956).

Thus we think that the lower court was mistaken in holding that *no* theory of estoppel could serve to bind the appellees. That error, however, was not prejudicial to these appellants under the facts of the case.

III. Applying the Law to the Chancellor's Facts

Appellant Murphy joined the firm of Haws & Burke in July, 1966. By his own admission he was from that

---

[9] The lower court relied on *Bell v. Johnston*, 281 Pa. 57, 126 A. 187 (1924), for the proposition that as between the alleged partners, an estoppel could not be worked to create a partnership. We think, however, that *Bell* holds only that the conduct there shown did not establish a partnership, and that the case does not speak to the question of partnership by estoppel.

[10] "§90. *Promise Reasonably Inducing Action or Forbearance.*

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires."

date until January, 1971 merely an employee of the firm. Similarly, appellant Slota, who became associated with the firm in June, 1967, was also by his own admission an employee until January, 1971. There is therefore no point in reviewing the evidence pertaining to any earlier period to determine whether Murphy and Slota were then general partners; they agree they were not.

In December, 1970, appellee Thomas J. Burke, who until that month had operated Haws & Burke as a sole proprietorship, incorporated the firm as a professional business corporation, listing himself on the papers of incorporation as the sole promoter and causing all stock to be issued in his name.[11] In November of 1970, the month previous to incorporation, Burke had individually and privately broached with his attorney-employees the subject of future employment as employees of the contemplated professional corporation. Although both Murphy and Slota testified that at this time Burke offered to accept them as "partners", but to operate under corporate form, the other two lawyer-appellees testified that no such offer had been made to them. The chancellor found in favor of the appellees. [12]

In January, 1971 a meeting was held at which the professional corporation's accountant reviewed the deferred compensation possibilities open to the employees of the corporation. Although appellant Slota testified that the subject of the meeting was "partnership", appellant Murphy testified that he did not recall that the

[11] Haws & Burke was incorporated under the newly enacted Professional Corporation Law, July 9, 1970, P. L. 461, No. 160, 15 P.S. §2901 et seq. (Supp. 1972-73).

[12] The chancellor found that "[i]n November or December of 1970, the defendant Thomas J. Burke . . . invited both individual plaintiffs as well as the other two individual defendants to participate *as employees* in a professional corporation to be formed." (Emphasis added.)

word was ever used, and all other participants testified that the meeting never touched on the subject of *proprietary interest* of the employees. The accountant was quite certain that nothing was said on the subject of "partners" because the tax consequences would be altogether different. Suffice it to say that the chancellor disbelieved appellant's version and credited that of the appellees. In May, 1971 appellee Burke delivered to the appellants drafts of agreements under which they might acquire interests in the professional corporation of Haws & Burke, provided they first execute a written employment agreement, a stock repurchase agreement, and an application for life insurance to be used to finance stock repurchase. The interests offered would have been about 15% each. Dissatisfied by what they viewed as onerous terms of the stock repurchase and a covenant not to compete contained in the employment agreement,[13] appellants terminated their relationship with Haws & Burke without ever having "alleg[ed], aver[red], suggest[ed], or otherwise claim[ed] that they were partners of the individual defendants or shareholders in the Professional Corporation of Haws & Burke."[14]

It is clear that the evidence supports the conclusions that (a) prior to January, 1971 there was no partnership, and that (b) after January, 1971 there was neither an agreement under which appellants acquired a

---

[13] Appellants argue that a covenant restricting their right to represent former Haws & Burke clients appeared in the draft of the employment contract (which they chose not to sign) and that the covenant violated the American Bar Association's Code of Professional Responsibility, DR 2-108(A), effective in Pennsylvania under this Court's Rules of Disciplinary Enforcement, Rule 17-3, 446 Pa. at xxv. However that may be, we fail to see how it is relevant in establishing that the appellants were partners of Thomas J. Burke.

[14] Chancellor's Adjudication, Finding of Fact No. 20.

proprietary interest, conduct from which such an agreement could be implied, or a representation by Burke upon which appellants relied to their detriment. We therefore affirm the decrees of the court below.

It is so ordered. Costs on appellants.