Brooks et al., Appellants, *v.* Conston et al.

70

Argued December 5, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Laurence H. Eldredge,* with him *Norris, Bell, Lex, Hart & Eldredge,* for appellants.

*Harry Shapiro,* with him *Hirsh W. Stalberg* and *Shapiro & Shapiro,* for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, March 24, 1947:

The question involved is whether the findings of fact of the chancellor, approved by the court in banc, are supported by the evidence.

The suit is in equity, by a fiduciary of an estate of a decedent, and others, to set aside the sale of a chain of millinery stores on the ground of inadequacy of consideration. Allegations are made and denied that a confidential relationship existed between the vendor and vendee and of the existence of fraud—actual and constructive. The learned court below found as a fact that no confidential relationship existed between the parties; that there was no fraud and that the consideration was fair, reasonable and fully adequate. The bill was dismissed. The appeals followed.

We have read the testimony with care. In important essentials it is undisputed. The chancellor's deductions

or inferences from undisputed evidence are reviewable by an appellate court. In *Sellers & Co., Inc., v. Clarke-Harrison, Inc.,* 354 Pa. 109, 46 A. 2d 497, we said, p. 118: "Most of the controlling findings are the result of deductions or inferences from the facts not in substantial dispute. In Blue Ridge Metal M. Co. v. N. Pa. P. Co., 327 Pa. 424, 194 A. 559, it was said (p. 432): 'While the findings of fact of a chancellor, supported by competent evidence, and affirmed by the court in banc, are conclusive upon appeal: Belmont v. Heist, 300 Pa. 542; Clark's Est., 303 Pa. 538; Brinton v. Davidson, 308 Pa. 371, such rule does not apply in favor of the deductions or inferences which are made by the chancellor from the facts which he has found. The conclusions of the chancellor being no more than his reasoning from the facts, are always reviewable upon appeal: Hamilton v. Fay, 283 Pa. 175; Lineaweaver's Est., 284 Pa. 384; Dorrance's Est., 309 Pa. 151.' See also: Hindman's Appeal, 85 Pa. 466; Crick v. Paull et al., 287 Pa. 431, 135 A. 103; Fidelity-Phila. Tr. Co., Ex., v. Lehigh Valley Coal Co., 294 Pa. 47, 143 A. 474; Lawrence v. King, 299 Pa. 568, 150 A. 169; Custis v. Serrill et al., 321 Pa. 154, 183 A. 774; Potter et al. v. Brown et al., 328 Pa. 554, 195 A. 901; Estate of Frank A. Boswell, Deceased, 109 Pa. Superior Ct. 365, 167 A. 402; Easton v. Koch et al., 152 Pa. Superior Ct. 327, 31 A. 2d 747." See also *Jac Estate,* 355 Pa. 137. The chancellor's conclusion that a confidential relation did not exist is not supported by the testimony. A confidential relation did exist between the parties, fraud was clearly shown, and it was not established that the consideration was fair, reasonable and adequate.

George D. Brooks, the decedent, with his wife Ethel, owned and conducted a chain of millinery stores located in Philadelphia, Pennsylvania, and in other cities. Some of the stores were operated by them individually and others by corporations, the entire capital stock of which they owned absolutely. The husband died suddenly on

July 14, 1941, at the age of 46 years. He left surviving him a widow, Ethel Brooks, (aged 41 years) and two minor children, Gertrude and William. He died testate. By the terms of his will the widow was to receive $200 per month for life and the residue was bequeathed to his two children. The widow is the administratrix c. t. a. of the estate. Gertrude intermarried with Perch P. Hankin. She is also the guardian of the estate of her minor brother William. The widow, individually and as fiduciary of her deceased husband's estate owns all of the capital stock of the seven co-plaintiff corporations herein. Until the death of decedent and the sale hereafter discussed, the business produced most satisfactory profits. Decedent spent some $30,000 on improvements, fixtures and furniture. At the time of death the annual sales approximated $300,000.

Harry Conston, the individual defendant, is a business man and operated a chain of retail hosiery and handbag stores in various cities and under various names. He was a close personal friend of the decedent and at one time lived next door. Decedent and defendant and their families were socially intimate and their children played together. Immediately upon the death of decedent Conston called upon the widow, and later in the day both he and his wife called; he met the minor son William when he came from school and informed the boy that thereafter Conston would look after him as a father; when the boy later entered a college defendant signed the application blank as guardian, although he did not bear that relationship in law; defendant also participated in the wedding of the daughter Gertrude and "gave away" the bride. Upon the death defendant commenced advising the widow concerning her conduct of the business. He strongly recommended that she sell the stores without delay. On the day of decedent's death defendant suggested to the widow that upon any sale of the business defendant should be given the first prefer-

ence to buy. Defendant told the widow "to go out and get bids on the business" and that he would "meet" whatever price any one else offered her. During the first four months following the death of decedent the widow made $42,000 unsecured loans to Conston, at his solicitation.

Within four months from the death a tentative offer was made by a business broker to purchase the business through Harry D. Stein, an accountant employed by decedent, who continued in the business after it was purchased by Conston. The offer came from a man by the name of Wanger, of Chicago. Mr. Wanger offered to pay $20,000 for all of the fixtures in the various stores; to pay the cost price of all salable merchandise, and an agreed price upon all shop worn or unsalable merchandise; and where leases had but a short time to run, to pay a percentage of the gross business done until the termination of the leases. Such an offer was tentative and depended upon verification of the existence and condition of the fixtures, and of inventories of stocks of merchandise as represented to Mr. Wanger. Mr. Stein communicated Mr. Wanger's offer to the widow as being $20,000 *for the whole.* According to Mr. Wanger, if the offer had been accepted, it would have involved a payment of approximately $40,000. The offer of Mr. Wanger having come to the knowledge of Conston, he made an offer to the widow of $21,000, which she verbally accepted. The attorney for the widow was Maxwell E. Verlin. Conston desired to go to his own lawyer, David S. Malis, but was persuaded by the widow to go to Mr. Verlin for the purpose of closing the deal. The defendant concluded to buy the business in the name of the Lee Stores, Inc., which he employed Mr. Verlin to incorporate under the laws of Pennsylvania. While Mr. Verlin and Mr. Stein were going over the details of the transaction the defendant, Mr. Conston, and the plaintiff, Mrs. Brooks, were talking. It was discovered that

certain of the leases were in the names of relatives of the deceased husband and that the widow would be required to pay a consideration for assigning the leases to Mr. Conston. Mr. Conston said: "While they were drawing the papers I called out to Mr. Verlin. I said, 'Mr. Verlin, make my price $22,500 from $21,000.' He said, 'Why?' I said, 'Just like that.' Then that raised the price to $22,500." At the trial when defendant was asked the reason for such increase he said, "I figured [Mrs. Brooks] would have to pay from two to three hundred dollars apiece, at the top five hundred. That was the reason I increased my sale price from $21,000 to $22,500."

The papers were drawn upon this basis. The purchase was financed by the defendant in this manner: he borrowed $10,000 from Mrs. Brooks on an unsecured loan. Out of the proceeds of the loan Conston made the down payment of $1,500. According to the agreement the balance was payable and was in fact paid in installments from July 1, 1942, to July 1, 1943. It was shown that the net profits earned by the stores which Conston purchased for the first ten and one half months of 1941 up to November 15, 1941, when Conston took possession, amounted to $28,794.34.

Before her marriage, Mrs. Brooks was a milliner and her husband was a salesman of millinery. Sometime after their marriage they started in business together in a store at 431 South Street, with a capital of a little more than $500 of the wife's money. Mrs. Brooks testified that she was interested in the making of the hats, but that her husband ". . . took care of everything so far as the business end of it." It was testified that as the business expanded and as corporations were formed, the husband looked after and managed all business details; the wife was named as an officer of the various corporations and also had stock in her individual name. She testified that she was wholly uninformed as to the

financial details of the business and had no experience whatever in financial matters.

Mrs. Brooks consulted no one except Conston concerning the sale of the business. The testimony reveals that she trusted Conston implicitly and relied solely upon his advice. It is true that she had an attorney, but the lawyer was never consulted concerning the price to be obtained. All he was requested to do was to draw the necessary legal documents to make the transfer of title from the estate of decedent to Conston.

When Mr. Conston advised Mrs. Brooks, he was dealing with a warm personal friend; he knew she was the fiduciary of her husband's estate, and that the interests of her two minor children were involved; as he was interested in purchasing, defendant occupied a dual capacity. It was incumbent upon him to exercise a far greater effort than he did in order to either sell the business to others or to secure a fair valuation thereof. As an experienced business man, Mr. Conston should have advised that all of the business assets be valued and appraised. Apparently no consideration was given to the ascertainment of the volume of business and the profit therefrom. All that Conston did, when he learned of the rather indefinite offer of Wanger, was to increase his own bid to $21,000. The subsequent raising of the price by $1,500, and the manner and for the reason assigned has already been narrated. Had Conston been truly concerned for the interest of the widow and minor children, and not influenced by his own desires to purchase, he would have made more strenuous efforts to follow up the offer of Mr. Wanger. It is not enough to establish that plaintiff secured a full, fair and adequate price for the business solely because (1) Conston increased by $2,500 the tentative offer of Wanger and (2) the extremely vague and indefinite statements of the witness Rockower that he did not regard the business as worth $25,000. Conston clearly

acted in his own interest and disregarded his obvious obligation to his friend who confided in him. He even secured a considerable unsecured cash loan from the widow to aid in the purchase. From the testimony, it is suggested that the profits from the business paid off the consideration within a few months, whereby Conston, in fact, paid nothing for the business.

We are not impressed with the argument that the widow's retention of the Camden store, against the advice of Conston, demonstrated that she exercised her own business judgment and was therefore not influenced by any confidential relationship. Such argument is dissipated when it is observed that Conston, to the contrary, testified that the Camden store was kept and not sold *upon defendant's advice.* Neither does the contest over Federal taxes change our view. Plaintiff's estimate of value was based upon what she *then* believed was the true value, and before the true situation was revealed to her.

Confidential relation is any relation existing between parties to a transaction wherein one of the parties is bound to act with the utmost good faith for the benefit of the other party and can take no advantage to himself from his acts relating to the interest of the other party : *Leedom v. Palmer,* 274 Pa. 22, 117 A. 410; *Harrison v. Welsh,* 295 Pa. 501, 145 A. 507; *Null's Estate,* 302 Pa. 64, 153 A. 137. This Court has recently defined confidential relationship in *Drob v. Jaffe,* 351 Pa. 297, 41 A. 2d 407. Mr. Justice HORACE STERN said, p. 300: ". . . a confidential relationship is not limited to any particular association of parties but exists wherever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest. . . ." That case was cited with approval in *Hamburg v. Barsky et al.,* 355 Pa. 462, 466, and in *Shook v. Bergstrasser,* 356 Pa. 167. See also: *McCown v. Fraser,* 327 Pa. 561,

192 A. 674; *Metzger v. Metzger,* 338 Pa. 564, 14 A. 2d 285; *Stewart Will,* 354 Pa. 288, 47 A. 2d 204; *Dichter Will,* 354 Pa. 444, 47 A. 2d 691. It plainly appears from the evidence that Conston occupied a confidential relation toward the widow and her minor children. As Conston took the property of the estate for his own use, in these circumstances, the burden rested upon him to establish the absence of fraud, and that the transaction was fair and equitable. This defendant failed to do.

There was a delay in this case for nearly four years from the date of the sale until the institution of the suit. The evidence discloses, however, that the friendship of the parties continued during the whole of this period. The daughter married a young man who afterwards became a lawyer. Mr. Verlin, plaintiff's counsel, became ill. The young lawyer, in going over estate matters, discovered what he deemed to be fraud on the part of Conston. He uncovered most of the facts above narrated. The delay in instituting suit was not intentional or deliberate. The facts were not known to Mrs. Brooks and were not discovered or reasonably discoverable until ascertained by the son-in-law. Her rights, and those of her children, will not therefore be lost because of laches.

Having determined that the findings of fact are not supported by the testimony; that a confidential relation existed between the plaintiff and defendant; that the defendant has not established that the transaction was free from actual or constructive fraud and that the defendant had not paid a full, fair and adequate price for the business, the decree of the court below must be reversed.

Decree reversed, bill re-instated, record remitted with direction to enter a decree in accord with the prayers of the bill, costs to be paid by the defendants.