Yuhas, Appellant, *v.* Schmidt.

448

Argued November 26, 1968. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Jerome J. Shestack,* with him *Robert A. Hanamirian, Ralph S. Snyder, Robert J. Levis,* and *Schnader, Harrison, Segal & Lewis,* and *Levis, Connors and Swanick,* for appellant.

*Richard P. Brown, Jr.,* with him *Thomas C. Sadler, Jr.,* and *Morgan, Lewis & Bockius,* for appellee.

OPINION BY MR. JUSTICE JONES, April 23, 1969:

William H. Ivens, Jr., a doctor of veterinary medicine, began practicing his profession at 60 Haverford Road, Ardmore, in 1934. John B. Schmidt and Theo-

dore V. Yuhas, appellant, began working for Dr. Ivens before they had graduated from veterinary school and continued working as full-time veterinarians after receiving their degrees.

Near the end of 1958 Dr. Ivens developed a serious heart condition which required him to reduce his work load considerably. At the same time, Drs. Schmidt and Yuhas became interested in acquiring a proprietary interest in the business; because of his heart condition, Dr. Ivens was receptive to their plans. An agreement was finally worked out among the three doctors, the exact terms of which are in dispute in this litigation. The three doctors consulted a lawyer to draw up the agreement, who, in turn, referred them to an associate specializing in taxation. Three documents were eventually executed.

The first document was the partnership agreement. Under this agreement, Drs. Schmidt and Yuhas as the active partners were each to receive a salary of $150.00 per week plus 45% of the net profits of the business; Dr. Ivens, the inactive partner, was to receive a salary of $500.00 per year and 10% of the net profits and he was to transfer certain equipment and accounts receivable to the partnership.

The second document was a deed transferring the real estate at 60 Haverford Road from Dr. Ivens to Drs. Schmidt and Yuhas as tenants in common for a consideration of $1.00. Dr. Ivens, pursuant to advice from his accountant, filed a federal gift tax return covering this transfer, wherein the property was valued at $50,000.00 subject to an $8,000.00 mortgage.

The third document was a lease in which Dr. Ivens as lessor leased certain kennels he owned in Doylestown to the partnership at a yearly rental of $11,500.00. At all times during the course of these events Drs. Ivens and Schmidt resided at the kennels at Doyles-

town, while Dr. Yuhas lived with his family at 60 Haverford Road.

The three doctors also entered into an oral agreement, the terms of which are in dispute. Dr. Ivens alleged, and the court below so found, that the agreement was to the effect that Drs. Schmidt and Yuhas would support Dr. Ivens for the remainder of his life in exchange for which Drs. Schmidt and Yuhas would take over Dr. Ivens' veterinary practice. Allegedly, the three doctors valued Dr. Ivens' capital contribution to the partnership at $250,000.00, including the property at 60 Haverford Road.

From January 1, 1961, until November 1, 1966, the partnership paid the following expenses: the $8,000.00 mortgage on the property at 60 Haverford Road, all maintenance costs for that property, all maintenance expenses for the kennels in Doylestown, and certain expenses incurred by Dr. Ivens in breeding and showing poodles. The payments in behalf of Dr. Ivens totalled $62,986.00 during this period.

As time wore on, Dr. Yuhas became dissatisfied with this arrangement. Dr. Ivens regained his health and expenses on his behalf increased yearly. Dr. Yuhas expressed an interest in revising the agreement so that the partnership's support of Dr. Ivens would terminate at some definite time in the future, but the three doctors were unable to agree on a revision. Finally, on September 1, 1966, Dr. Yuhas served written notice on the other two doctors that he was dissolving the partnership upon receipt of the notice. Drs. Ivens and Schmidt considered this a violation of the agreement since the agreement contains no provision for unilateral dissolution of the partnership and because a partner must give sixty days' notice of his intention to withdraw from the partnership.

Since Drs. Ivens and Schmidt were not receptive to dissolving the partnership, Dr. Yuhas began the first

of the four suits involved in this controversy against Dr. Schmidt for a partition of the property at 60 Haverford Road. At this time Dr. Schmidt moved from the Doylestown kennels to 60 Haverford Road in order to protect his share of the business. From this time on the partners engaged in activity toward each other which can only be termed puerile. One such incident led to the second suit. Dr. Ivens had had the partnership truck driven from the Doylestown kennels to 60 Haverford Road to deliver some dogs and, while the truck was in the garage, Dr. Yuhas deflated the tires and drove his wife's car into the driveway to block any exit by the truck. Dr. Ivens responded by withdrawing all of the partnership funds from the bank and depositing the same in his own name in another bank. Dr. Yuhas then instituted a suit to enjoin Dr. Ivens from withdrawing these funds.

The third suit was started after Dr. Yuhas had sent out announcements that he was withdrawing from the partnership but was continuing his veterinary practice. On the announcement he listed three telephone numbers, two of which had originally been registered in Dr. Ivens' name and had since been used by the partnership. When Dr. Ivens attempted to have these two numbers disconnected, Dr. Yuhas filed suit against his two "partners" and the Bell Telephone Company, requesting the court to appoint a receiver to wind up the partnership affairs.

The fourth suit was instituted by Dr. Ivens against Drs. Schmidt and Yuhas, asserting that the two defendants had violated the alleged oral agreement and asking that Dr. Yuhas be enjoined from interfering with the partnership business at 60 Haverford Road and from conveying that property. A fifth suit, which is not involved in the present appeal, was brought by Drs. Ivens and Schmidt against Dr. Yuhas, seeking to

enjoin him from interfering with any phase of the business conducted at 60 Haverford Road.

At the pretrial conference it was agreed that all the suits would be consolidated and tried in the Court of Common Pleas of Delaware County at one time. At the time of trial, most of the issues had become moot. The Chancellor concentrated on the two remaining issues: (1) what legal and equitable interests were created by the conveyance of 60 Haverford Road to Drs. Schmidt and Yuhas? (2) how were the rights of the parties affected by the breach of the contract to support Dr. Ivens for the remainder of his life?

The Chancellor found that Drs. Schmidt and Yuhas had, in fact, violated the contract for support and that this breach justified a rescission of the entire agreement. In its decree, the Chancellor ordered that the partnership agreement be rescinded; that Drs. Yuhas and Schmidt execute a deed conveying 60 Haverford Road back to Dr. Ivens; that Dr. Ivens account to his former partners for their accretions to the partnership assets; and that Drs. Schmidt and Yuhas should yield complete possession of all partnership property and assets within ninety days. The Court en banc finalized this decree, and Dr. Yuhas appealed to this Court.

The first issue involves the Chancellor's fourth finding of fact: "Ivens, Schmidt and Yuhas entered into an oral agreement providing for the support of Ivens in return for the ultimate conveyance of the Ivens' veterinarian business and property to Schmidt and Yuhas." We are mindful that the findings of the Chancellor will not be reversed unless it appears that he has clearly abused his discretion or committed an error of law (*Durso v. D'Urso*, 409 Pa. 487, 187 A. 2d 270 (1963); *Shydlinski v. Vogt*, 406 Pa. 534, 179 A. 2d 240 (1962)) and that the findings have the full force of a jury verdict and, if supported by sufficient evidence and if affirmed by the court en banc, will not

be disturbed on appeal (*Girard Trust Bank v. Sweeney*, 426 Pa. 324, 231 A. 2d 407 (1967)). As we stated in *Masciantonio Will*, 392 Pa. 362, 367, 141 A. 2d 362 (1958), "The test is not whether we, the appellate court, would have reached the same result had we been acting as the hearing judge who saw and heard the witness, 'but rather whether a judicial mind, on due consideration of the evidence, as a whole, could reasonably have reached the conclusion of the chancellor.'"

We are satisfied that there is sufficient evidence in the record to support this finding by the Chancellor. Dr. Yuhas admitted the partners had reached an understanding on the support question, although at no time did he admit that he and Dr. Schmidt had agreed to support Dr. Ivens for the remainder of his life.[1] Dr. Schmidt did testify that he and Dr. Yuhas had so agreed. Two other witnesses, including an attorney who worked on the partnership agreement, testified that Drs. Schmidt and Yuhas agreed to support Dr. Ivens for the rest of his life.[2] In short, we can find

---

[1] Dr. Yuhas testified as follows in a deposition dated December 9, 1966, at pages 64 and 65: "Q. So that in addition to the rent of $11,500 you paid the things that kept Dr. Ivens going up there; isn't that right? A. That is right. . . . Q. Now this extra payment was made as a result of an arrangement made between you and Dr. Schmidt and Dr. Ivens prior to the formation of the partnership agreement, isn't this so? A. Yes, in part, right. Q. So that you three had in effect agreed to these things that I am telling you about, including the extra payment, at the time before, whatever happened, Ivens transferred the business and the property to you, didn't you? A. Yes."

[2] The lawyer testified that Drs. Schmidt and Yuhas "told me that Dr. Ivens, who was the employer of Drs. Yuhas and Schmidt, wished to withdraw from the active practice of veterinarian medicine; that he owned all of the assets of the veterinarian practice; that they wished to secure their positions and they were willing to support Dr. Ivens for the rest of his life in return for being assured of the assets of the veterinarian practice."

no basis in the record for reversing this finding by the Chancellor.

Dr. Yuhas argues that, while this may be true, the fact is that Dr. Ivens signed a federal gift tax return stating, under penalty of perjury, that the transfer of the property at 60 Haverford Road was a gift. There is no denial that Dr. Ivens signed the return, but this does not end the matter. From reading the record, one conclusion stands out. Most of the legal work in setting up the partnership was done by a lawyer and an accountant specializing in taxation. It is not clear that they were aware of exactly what the future partners had agreed.[3] It is clear that they had estate planning in mind when they suggested that Dr. Ivens convey his property to Drs. Schmidt and Yuhas as an *inter vivos* gift rather than as a bequest in his will. The following facts are crucial in this regard. First, it was the accountant's suggestion that Dr. Ivens file a gift tax return on this conveyance. Second, the return was executed by the accountant. Third, Dr. Ivens testified that he could not remember whether he had read the return or even whether he had signed it. Fourth, the partnership paid the amount due on the gift tax return. Fifth, Dr. Ivens testified that his accountant regularly filled out his federal income tax return and that he seldom, if ever, checked over the return before signing it. In short, there is sufficient evidence in the record from which the Chancellor could have found that Dr. Ivens took no interest whatsoever in tax matters and that he was not aware of the consequences of his signing the gift tax return. We conclude, therefore, that even though Dr. Ivens signed the

---

[3] Both the lawyer who apparently actually drew up the partnership agreement and the partnership's accountant testified that they were not aware of an oral promise to support Dr. Ivens for the remainder of his life.

gift tax return, there is ample evidence in the record to justify the conclusion that he never intended to convey the property as a gift. On the state of the record, a conclusion that he intended to make the conveyance as a gift would be almost incredible. It is highly unlikely that a veterinarian with a good practice would "give" the practice away without some assurance that his needs would be taken care of for the remainder of his life. Of course, in finding that Dr. Ivens received consideration for the conveyance of the property, we express no opinion as to whether he committed perjury in filing a gift tax return.

Dr. Yuhas' second contention is that since there were three written documents which, on their face, seem to cover the entire agreement between the partners, the Chancellor violated the parol evidence rule in even considering the oral agreement. As a general statement of law this is correct. However, we have long recognized an exception to the parol evidence rule which applies to this case: "Where a party . . . seeking to have a written agreement enforced according to its terms, *admits* in his own trial testimony that the agreement in writing did not *fully* and *completely* state the entire agreement between the parties, then parol evidence is admissible to explain and supplement such written agreement." *Slavinski Estate*, 420 Pa. 504, 509, 218 A. 2d 125 (1966). See also, *Dunn v. Orloff*, 420 Pa. 492, 496, 218 A. 2d 314 (1966); *Universal Film Exchanges, Inc. v. Viking Theatre Corp.*, 400 Pa. 27, 36, 161 A. 2d 610 (1960); *Boyd Estate*, 394 Pa. 225, 233, 146 A. 2d 816 (1958). Dr. Yuhas admitted in his testimony that the partners had agreed on a provision for the support of Dr. Ivens, although he did not admit that the partners had agreed to support Dr. Ivens for the rest of his life.[4] There is no requirement

---

[4] See note 1, supra.

in this exception to the parol evidence rule that the person attempting to enforce the written contract admit the entire oral agreement. It is only necessary that he admit that there was some oral agreement. When he has made such an admission, the Chancellor can then receive evidence to determine the terms of the oral agreement.

Dr. Yuhas states in bold print in his brief that "It is inconceivable that [the partners] would have failed to put into writing what Dr. Ivens now contends was the most important provision of all—the alleged support." Dr. Yuhas overlooks three important considerations. First, the lawyer and accountant who were responsible for drawing up the three documents testified that they were not aware of any oral agreement. Second, if they were aware, a conceivable reason for omitting any reference to the agreement for support was the fact that it would have belied the gift tax return executed on behalf of Dr. Ivens. Third, and most important, when the partnership was formed, the three doctors had complete confidence in each other and they thought they had agreed on all aspects of the partnership. They were content to let their lawyer and accountant—who were primarily concerned with the tax aspects of the partnership—draw up the necessary legal papers, secure in the satisfaction that they had already agreed among themselves on the terms of the partnership.

Dr. Yuhas' third contention concerns the Chancellor's holding that the conveyance of the property at 60 Haverford Road from Dr. Ivens to Drs. Schmidt and Yuhas as tenants in common created a resulting trust in favor of the partnership. He reached this conclusion by holding that the partnership and not Drs. Schmidt and Yuhas actually paid Dr. Ivens for the property. This settlement was in the form of the various support payments on behalf of Dr. Ivens.

The general principles involving resulting trusts are set forth in the Restatement 2d, Trusts (1959). Section 404 states: "A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the inference is rebutted or the beneficial interest is otherwise effectively disposed of." Section 440 continues: "Where a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid, except as stated in [three sections which are not relevant to this case]."

In determining that the partnership was the real beneficial owner of the property, the Chancellor considered the following factors: the partnership did not pay rent for the use of the property to the record title holders; the property was listed as a partnership asset on all the partnership's books and records; the partners depreciated the property on the partnership income tax return; and the partnership paid the mortgage on the property and all maintenance expenses. As far as the payment for the property is concerned, there is no question that the partnership paid Dr. Ivens an amount sufficient to cover his heat, electric and telephone bills, dog show expenses, travel promotion, automobile expenses and the salaries of his housekeeper, gardener and kennelman.

Dr. Yuhas argues that there is an important element necessary to establish a resulting trust that Dr. Ivens has not made out, namely, that the partnership agreed to pay the purchase price. Dr. Yuhas misconstrues the holding of the Chancellor. There can be no question that the partnership agreed to pay Dr. Ivens' expenses. What Dr. Yuhas apparently contests is the finding that the partnership was the beneficial owner

of the property. While admitting that the partnership appeared to exercise dominion over the property, Dr. Yuhas argues that this was the result of a mistake on the part of the accountant. This is but another example in the record of how the partnership agreement was framed solely in reference to the tax aspects, apparently ignoring what the partners had actually agreed. The accountant's testimony indicates to us merely that he was primarily concerned with saving on taxes for the partnership and was not really concerned about whether the three doctors looked upon the property as belonging to the partnership or to Drs. Schmidt and Yuhas.[5] The fact is that the partnership conducted its business at 60 Haverford Road and, to all intents, it was treated as partnership property.

Dr. Yuhas' fourth contention concerns the Chancellor's ruling that the entire partnership agreement should be rescinded. The Chancellor reasoned that, since this was a contract for support, it was still executory until fully performed and that, since it was totally breached before performance had been completed, rescission was the proper remedy.

Although as a general rule a deed which is otherwise valid will not be invalidated because of total or partial failure of consideration, there is an exception to this rule where the deed is given in exchange for

---

[5] The accountant testified: "Q. When you made up that statement [which was drawn up when Dr. Yuhas attempted to dissolve the partnership] you eliminated from the statement the real estate as a partnership asset? A. Yes. Q. Why did you do that? A. I thought it would be easier at settlement if we kept the real estate as one transaction. Q. How could you do that when all through the years it had been included as a partnership asset, partnership property? A. I would say that perhaps I was incorrect, our firm was incorrect in treating it as a partnership asset during the five year period that it was so treated, but it didn't mean anything tax-wise because the depreciation was taken off."

a promise to support. If the grantee fails to furnish the support according to the terms of the agreement, equity will decree a rescission. *Bruno v. Bruno*, 404 Pa. 502, 504, 172 A. 2d 863 (1961); *Payne v. Winters*, 366 Pa. 299, 308, 77 A. 2d 407 (1951); *Shook v. Bergstrasser*, 356 Pa. 167, 172, 51 A. 2d 681 (1947); Restatement, Contracts, §354, Illustration 1 (1932).

Dr. Yuhas argues that this exception was intended to protect the aged and infirm where the agreement to support arose in a family-type setting and should not apply to arm's length agreements. Although Dr. Yuhas is correct in indicating that most cases involving this exception have involved family-type contracts, there is nothing in the exception itself or in the case law to indicate that the exception should be confined to this type of contract. If the facts of this case fit the exception, and we agree with the Chancellor that they do, then the exception should apply.

Dr. Yuhas draws our attention to the *Bruno* case in which we held that, if the promise to support is not the total consideration, rescission will not lie. *Bruno*, supra, at 505. Dr. Yuhas argues that the agreement to support was not the only consideration and that all the terms other than the support agreement have been satisfied. We cannot agree. Viewing the transaction as a whole, the terms of the contract were to the effect that Dr. Ivens would transfer the property at 60 Haverford Road and his veterinary practice to Drs. Schmidt and Yuhas in exchange for the promise to support him for the remainder of his life. Admittedly, Drs. Schmidt and Yuhas provided adequate support until November 1, 1966, but at that time the support ceased altogether, so that the Chancellor was justified in considering this a failure of consideration justifying rescission.

Dr. Yuhas' final contention is that Dr. Ivens is not entitled to equitable relief because of the "clean hands"

doctrine. Dr. Yuhas maintains that Dr. Ivens is barred from relief because he is now claiming that he transferred the property at 60 Haverford Road for full consideration whereas when he previously filed the gift tax return he claimed that he had transferred the property as a gift. We have already noted above that the evidence in the record justifies the conclusion that the gift tax return was prepared by an accountant as part of an estate planning scheme for Dr. Ivens' benefit and that there is no evidence that Dr. Ivens was aware of the legal consequences of his signing the return. We are convinced that there was no deliberate inconsistency or dishonesty in Dr. Ivens' actions. Therefore, we hold that Dr. Ivens is not barred from recovery by the "clean hands" doctrine.

Decree affirmed. Appellant pay costs.

Mr. Justice ROBERTS concurs in the result.