363 A.2d 1267

Blanche FROWEN, a widow, Appellant,

v.

J. Marshall BLANK, Appellee.

Superior Court of Pennsylvania.

Sept. 27, 1976.

Robert J. Milie, Waltz & Milie, Greensburg, for appellant.

Christ C. Walthour, Jr., Kunkle, Walthour & Garland, Greensburg, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

SPAETH, Judge:

This appeal is from the dismissal of an action in equity to rescind an agreement of sale. At the conclusion of appellant's case, the trial judge dismissed the complaint on the ground that appellant had failed to sustain her burden of proof on the question of fraud. Exceptions were dismissed by a court en banc with one judge dissenting. Appellant's position is that if she did not prove fraud, she did prove a breach of confidential relationship. Although we are inclined to agree with her, we cannot be

sure, for the trial judge failed to make findings of fact. Rather than reverse, therefore, we remand.

I

■■ Our courts have long recognized the common law doctrine that an agreement may be rescinded when one party takes advantage of a confidential relationship by overreaching. When a confidential relationship exists, the presumption applicable in an arms' length transaction—that each party is acting in his own best interests and realizes the other is too—does not apply. Instead, the one party may trust the other to treat him fairly. This trust results in a lowering of the defenses one would normally raise when dealing with a stranger. *Leedom v. Palmer*, 274 Pa. 22, 117 A. 410 (1922). *See also, McClatchy Estate*, 433 Pa. 232, 249 A.2d 320 (1969); *Drob v. Jaffe*, 351 Pa. 297, 41 A.2d 407 (1945).

■■ Whether a confidential relationship exists depends on the facts of each case; if it is shown, the burden shifts to the other party:

> Confidential relation is not confined to any specific association of the parties; it is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself. It appears when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. When these circumstances appear, the law presumes the transaction void, unless the party claiming the benefit of such transaction shows affirmatively that no deception was used and the act was the intelligent and understood act of the grantor, fair, conscientious, and beyond the reach of suspicion.

*Leedom v. Palmer*, supra, 274 Pa. at 25, 117 A. at 411.

Thus, the plaintiff's burden is much less onerous than in a case of fraud. In *Young v. Kaye*, 443 Pa. 335, 279 A. 2d 759 (1971), Mr. Justice ROBERTS stated:

> When the relationship between persons is one of trust and confidence, the party in whom the trust and confidence are reposed must act with scrupulous fairness and good faith in his dealings with the other and refrain from using his position to the other's detriment and his own advantage. *McCown v. Fraser*, 327 Pa. 561, 192 A. 674 (1937); *Null's Estate*, 302 Pa. 64, 153 A. 137 (1930); *Popovitch v. Kasperlik*, 70 F.Supp. 376 (W.D.Pa.1947); see generally 17 C.J.S. *Contracts* § 184 (1963). This well settled doctrine, founded on strong considerations of public policy, renders inapplicable the general rule requiring an affirmative showing of fraud. To the contrary, transactions between persons occupying a confidential relationship are prima facie voidable, and the party seeking to benefit from such a transaction must demonstrate that it was "fair, conscientious, and beyond the reach of suspicion." *Leedom v. Palmer*, 274 Pa. 22, 25, 117 A. 410, 411 (1922).

*Id.* at 342, 279 A.2d at 763.[1]

## II

Appellant is a widow in her nineties. When she signed the agreement in question, she was 86 years old, and had been suffering from a loss of hearing and sight, in addition to other usual afflictions of old age. The agreement is dated May 22, 1968, and by it appellant purportedly agreed to sell a 70 acre farm that had been her home for almost 50 years. The purchase price is $15,000. Of this only $500 was paid. The remaining $14,500 is not due until one year after appellant's death. Until then appellee is to pay 5% interest on the $14,500, in quarterly pay-

1. *See also McClatchy Estate, supra; Carson Estate,* 431 Pa. 311, 245 A.2d 859 (1968); *Brooks v. Conston,* 356 Pa. 69, 51 A.2d 684 (1947).

ments. A life estate is reserved to appellant in the house and garden, and in the income of any gas lease which is made on the premises, and appellee is to maintain the house in good repair. Appellant's expert witness testified that as of the date of the agreement the fair market value of the farm was $500 per acre, or $35,000.[2]

For some time before the agreement, appellant had been renting out most of her property to a third party for pasture. Appellant has little formal education—no more than two years—and she left all business matters to her son. She has never learned to drive and relied on friends and neighbors to transport her whenever she had to leave the farm. In the early 1960's appellee and his wife purchased the farm next to appellant's farm. A close social relationship quickly developed between the parties. They visited each other often. Appellant taught the younger couple farm-related crafts such as canning and preserving fruits and vegetables. On occasion appellee helped appellant with tasks on her farm. He also rented her barn for the storage of machinery. Despite the disparity of their ages, appellant often went out socially with appellee and his wife. They went out to dinner to celebrate appellant's and appellee's birthdays, which were only one day apart. Appellee and his wife also drove appellant to affairs she liked to attend, such as fairs, grange meetings, and VFW Auxiliary meetings.

After several years of this close relationship, on April 14, 1967, appellant signed a one page handwritten document drafted by appellee. Generally, this stated that appellant agreed to sell her farm to appellee for $15,000. Approximately one year later, appellee drove appellant to the office of his attorney, where she signed the more detailed agreement of May 22, 1968, which had been prepared by the attorney according to appellee's instruction, and which has been summarized above.

---

**2.** Since the complaint was dismissed at the conclusion of appellant's case, this is the only evidence of fair value.

Appellant introduced the testimony of several witnesses to the effect that at or near the time of the signing of the agreement, appellant was extremely hard of hearing. While there is some dispute as to whether appellant had a hearing aid, this testimony is significant in light of the testimony of both appellee and appellee's attorney that the agreement was not read by appellant before she signed it, but was read to her.

There is dispute as to whether appellee performed his duties under the agreement. It appears, however, that before the trial, appellant was forced to move out of the house when part of the ceiling fell, and to move in with one of her daughters.

Between the time of the signing of the agreement and the time of appellant's move to her daughter's home, appellant became more dependent on appellee. She looked to him for help in matters other than just the repair of her house. He paid the taxes on her farm, in accordance with the agreement, and he often went into town to cash checks for her at the bank. During this period, according to the testimony of appellant, she thought she was merely renting the farm to appellee just as she had previously rented it to another farmer: she continued to live in her house, as she always had; and appellee's quarterly payments of interest on the outstanding $14,500 more closely approximated payments of rent than of a purchase price.

### III

The foregoing facts, if accepted, would show a confidential relationship: appellant and appellee "[did] not deal on equal terms," and on appellant's side, there was "weakness, dependence, or trust, justifiably reposed" in appellee. *Leedom v. Palmer, supra,* 274 Pa. at 25, 117 A. at 411. Thus, "an unfair advantage [was] possible." *Id.* Moreover, the provisions of the agreement suggest that unfair advantage was taken; especially does this sugges-

tion arise from the purchase price of less than half of fair value and the delay payment of even that. To be sure, these provisions may have been in consideration of appellee's friendship and past favors. However, it would be appellee's burden to show that that was so, and that the agreement was " 'fair, conscientious, and beyond the reach of suspicion.' " *Young v. Kaye, supra* at 342, 279 A.2d at 763, quoting *Leedom v. Palmer, supra*.

In *Brooks v. Conston*, 356 Pa. 69, 51 A.2d 684 (1947) the Supreme Court found the existence of a confidential relationship in a case strikingly similar to the present case. *Brooks* also involved a widow with limited business experience. Soon after the death of her husband the widow's close friend and neighbor persuaded her to sell him a chain of stores that had been run by her husband. The purchase was for inadequate consideration and the neighbor borrowed the money needed for the purchase price from the widow herself, repaying out of the profits of the stores, which was similar in effect to appellee's delayed obligation.

Despite these considerations, we do not consider that reversal is warranted. The judge below, sitting in equity as a chancellor, was the ultimate fact-finder. The Pennsylvania Rules of Civil Procedure require that in equity actions the legal issues as well as the court's findings of fact be expressly delineated in an opinion. Rule 1517 states, in pertinent part:

(a) The court shall make an adjudication and may do so before the testimony has been transcribed. The adjudication shall consist of (1) a statement of the issues; (2) a closely condensed chronological statement, in narrative form or in separate findings, of all the facts which are necessary to be known in order to determine the issues; (3) a discussion of the questions of law involved and the court's conclusions of law and (4) a decree nisi.

However, in the opinion of the court below there are no findings of fact, and the issue of confidential relationship is never discussed. Consequently, it is impossible for this court to decide whether appellant made out a prima facie case on the issue of confidential relationship; we do not know how much, if any, of appellant's evidence was found credible or competent by the chancellor.

We therefore remand for findings of fact and conclusions of law consistent with Rule 1517 of the Rules of Civil Procedure. After the chancellor has made such findings and conclusions, he shall enter a decree consistent with them.