403 A.2d 585

**Harry W. FROWEN, Executor of the Estate of Blanche Frowen, Deceased, Appellant,**

v.

**J. Marshall BLANK.**

Superior Court of Pennsylvania.

Argued Oct. 23, 1978.

Decided May 10, 1979.

Robert J. Milie, Greensburg, for appellant.

Christ C. Walthour, Jr. and with him S. Wayne Whitehead, Greensburg, for appellee.

Before VAN der VOORT, SPAETH and MONTGOMERY, JJ.

VAN der VOORT, Judge:

The instant action was instituted by Blanche Frowen, now deceased, to rescind an agreement for the sale of realty to the appellee. The property in issue was a farm occupied by

the decedent and the appellee was a neighbor. The lower court held a hearing, and thereafter dismissed the complaint, holding that the plaintiff failed to sustain her burden of proof on the issue of fraud. After appeal, our Court remanded [242 Pa.Super. 276, 363 A.2d 1267] to the lower court for a decision, including findings of fact and conclusions of law, on the issue of whether appellee had breached any confidential relationship with the appellant. The lower court carried out the remand instructions of this Court, concluded that no breach of a confidential relationship had been proven, and prepared an opinion containing findings of fact and conclusions of law in support of that result. This appeal followed by the executor of the estate of the deceased widow. We find no basis for reversal.

The standard of review by an appellate court in an equity case has been discussed many times. It has been held that the findings of the chancellor will not be reversed unless it appears that he has clearly abused his discretion or committed an error of law. *Yuhas v. Schmidt,* 434 Pa. 447, 258 A.2d 616 (1969). The chancellor's findings have the full force of a jury verdict, and if supported by sufficient evidence, and if affirmed by the court en banc, will not be disturbed on appeal. *Herwood v. Herwood,* 461 Pa. 322, 336 A.2d 306 (1975); *Girard Trust Bank v. Sweeney,* 426 Pa. 324, 231 A.2d 407 (1967); *Philadelphia Fresh Food v. M. Levin & Co.,* 239 Pa.Super. 288, 361 A.2d 886 (1976).

We believe there is clearly sufficient evidence to support the lower court's findings, which were affirmed by the court en banc, and find no abuse of discretion or error of law. The record, briefly stated, shows that the plaintiff, an elderly widow, became quite friendly with the appellee and his family, who were her neighbors. Over the course of several years, they showed the plaintiff numerous kindnesses and extended many favors to her. For instance, the appellees regularly included their neighbor in their social affairs and transported her to events she wished to attend. After several years as neighbors, the parties struck an agreement whereby the decedent agreed to sell the appellee

her farm, in an arrangement that was clearly an excellent financial deal for the appellee. The decedent retained a life estate and other rights in the property. Before the agreement was signed by the widow, she had the papers explained to her by not only one, but by two attorneys. While these attorneys were the appellee's attorneys, there appears no basis whatsoever in the record to cast any doubt on the veracity of testimony offered by the one who testified before the lower court concerning the circumstances of his meeting and discussion with the decedent. Nor is there any evidence to give rise to any inference that these attorneys followed less than the highest standards of professional integrity in fully explaining the document to the decedent. The testimony offered by the attorney, in summary, was that the agreement was thoroughly explained in every detail to the decedent, who appeared to hear and understand all that was explained. She asked many questions about the agreement, especially the financial terms, and seemed well pleased that the agreement expressed her understanding and desire. Of course, the record also contained the testimony of the appellee, which also directly negated any argument of a breach of a confidential relationship.

Balanced against this evidence was the testimony of the decedent herself, who was still living at the time of trial. She essentially testified that she did not understand the agreement, and believed she was renting and not selling her property. We note just a few factors which create doubts as to the decedent's testimony. First, while the property had a market value clearly exceeding the price called for in the sales agreement, the appellee was bound to ultimately pay $15,000.00 for the property, plus interest on the unpaid balance until the sales price was fully paid. Such an arrangement sounds little like any common lease procedure with which we are familiar. Next, the instant action was not filed until over five years after the agreement between the parties was reached. This creates as great an inference of a change of mind by the decedent as it does an inference of any alleged discovery that the written agreement did not represent what the decedent intended.

As noted, we have only highlighted the evidence of record. Based upon the record as a whole, we find no ground for holding that the lower court clearly abused its discretion in its factfinding role or committed any error of law. Further, we endorse its conclusion that there was no evidence to support a claimed breach of a confidential relationship by appellee. As was stated by the Supreme Court in *Masciantonio Will*, 392 Pa. 362, 367, 141 A.2d 362, 365 (1958): "The test is not whether we, the appellate court, would have reached the same result had we been acting as the hearing judge who saw and heard the witness, ' "but rather whether a judicial mind, on due consideration of the evidence, as a whole, could reasonably have reached the conclusion of the chancellor" '."

Affirmed.

SPAETH, J., files a dissenting opinion.

SPAETH, Judge, dissenting:

In November 1973, appellant's decedent, Blanche Frowen, filed the present action in equity asking the lower court to rescind an agreement of sale. After a hearing, the lower court dismissed the complaint on the ground that appellant's decedent had failed to sustain her burden of proof with respect to the question of fraud. On appeal to this court the case was remanded to the lower court with instructions to decide whether there had been a breach of a confidential relationship by appellee, this decision to be accompanied by findings of fact and conclusions of law consistent with Rule 1517 of the Rules of Civil Procedure. *Frowen v. Blank*, 242 Pa.Super. 276, 363 A.2d 1267 (1976). The lower court has now filed an opinion containing findings of fact and conclusions of law in support of its original decision dismissing the complaint. The issue on this appeal is whether the lower court erred in holding that appellant's decedent did not prove a breach of a confidential relationship. The majority affirms; I should reverse.

On remand the lower court made the following findings of fact:

150

1. Plaintiff filed an action in equity seeking the recision of a written agreement of sale between the Plaintiff and the Defendant dated May 22, 1968, and duly recorded in the Office of the Recorder of Deeds of Westmoreland County, Pennsylvania, in Deed Book Volume 1986, page 315.

2. The above referred-to agreement was prepared by S. Wayne Whitehead, Esquire, from information received from the Plaintiff and the Defendant.

3. The Plaintiff, Blanche Frowen, is a widow who at the time of the execution of the agreement in this matter was eighty-six (86) years of age having been born on July 13, 1882.

4. The Plaintiff, Blanche Frowen, prior to May 22, 1968, was the owner of a tract of land containing approximately seventy (70) acres more or less including a dwelling house and various outbuildings.

5. The agreement set forth a purchase price of fifteen thousand ($15,000.00) dollars of which five hundred ($500.00) dollars was paid, the remaining fourteen thousand five hundred ($14,500.00) dollars was not due until after the Plaintiff's death. Defendant was required to and did pay five (5%) per cent interest on the fourteen thousand five hundred ($14,500.00) dollars in quarterly installments. A life estate was reserved to the Plaintiff in the house and garden and in addition, any income from gas leases was reserved to the Plaintiff.

6. On May 22, 1968, the Plaintiff executed the agreement as set forth hereinabove.

7. On May 22, 1968, the Plaintiff was fully aware of the contents of the agreement, the meaning of the agreement, and the effect of the agreement.

8. No testimony was offered by the Plaintiff of undue influence, fraud, or breach of a confidential relationship or mental disability.

9. That on May 22, 1968, the Plaintiff and the Defendant were present before S. Wayne Whitehead, Esquire, who thoroughly reviewed the agreement page by page,

paragraph by paragraph, with the Plaintiff before the agreement was executed by the Plaintiff and the Defendant.

10. On May 22, 1968, the agreement was executed by the Plaintiff and the Defendant before two attorneys after a careful explanation to the Plaintiff of the contents of the agreement.

11. The Plaintiff completely understood the terms and conditions of the agreement dated May 22, 1968, as a result of discussions between S. Wayne Whitehead, Esquire, Howard M. Whitehead, Esquire, and Plaintiff.

12. On May 22, 1968, Plaintiff displayed before independent witnesses no hesitancy as to her ability to comprehend the significance of the agreement.

13. The Defendant did take the Plaintiff to various community activities when the Plaintiff requested Defendant to do so.

14. Friends of the Plaintiff, Blanche Frowen, took her to various card parties, Grange meetings and homemakers' meetings.

15. Defendant's relationship with the Plaintiff was that of a neighbor and a friend which did not result in the Defendant taking advantage of the friendly or neighborly relationship.

16. The testimony of S. Wayne Whitehead was clear and convincing that the Plaintiff was competent, and fully aware of the contents of the agreement and entered into the agreement willingly and after careful deliberation in the attorney's office.

17. The transaction was one without fraud, undue influence and that the Defendant did not take advantage of any confidential relationship between the Plaintiff and the Defendant.

18. The Plaintiff offered no testimony as to having any evidence regarding any actions of the Defendant which may be considered a breach of a confidential relationship.

19. There was no confidential relationship between Plaintiff and Defendant.

It is settled that "a chancellor's findings of fact . . . have the force and effect of a jury verdict and will not be disturbed on appeal if supported by adequate evidence." *Cowen v. Krasas,* 438 Pa. 171, 173, 264 A.2d 628, 629 (1970); *see In the Matter of the Estate of McKinley,* 461 Pa. 731, 337 A.2d 851 (1975). It is equally settled, however, that "[w]hen a finding of fact is simply a deduction from other facts and the ultimate fact in question is purely a result of reasoning, the appellate court may draw its own inferences and arrive at its own conclusions from the facts as established." *In the Matter of the Estate of McKinley, supra,* 461 Pa. at 734 n. 1, 337 A.2d at 853 n. 1.

Here the lower court's findings that appellant's decedent was 86 years old at the time of the agreement and that she owned the farm are examples of factual findings that cannot be disturbed. So also are the findings with respect to the price, the terms, and the execution of the agreement of sale. However, the lower court's "findings" that appellee did not take advantage of any confidential relationship, that no confidential relationship existed, and that there was no fraud or undue influence on the part of appellee, are mislabeled; rather than findings, they are inferences and conclusions drawn from the record, and with respect to these we must make our own independent examination of the evidence.

In remanding, this court had occasion to discuss the evidence presented on the record. On that appeal Ms. Frowen was the appellant and we summarized the evidence as follows:

Appellant is a widow in her nineties. When she signed the agreement in question, she was 86 years old, and had been suffering from a loss of hearing and sight, in addition to other usual afflictions of old age. The agreement is dated May 22, 1968, and by it appellant purportedly agreed to sell a 70 acre farm that had been her home for almost 50 years. The purchase price is $15,000. Of this only $500 was paid. The remaining $14,500 is not due

until one year after appellant's death. Until then appellee is to pay 5% interest on the $14,500, in quarterly payments. A life estate is reserved to appellant in the house and garden, and in the income of any gas lease which is made on the premises, and appellee is to maintain the house in good repair. Appellant's expert witness testified that as of the date of the agreement the fair market value of the farm was $500 per acre, or $35,000.[2]

For some time before the agreement, appellant had been renting out most of her property to a third party for pasture. Appellant has little formal education—no more than two years—and she left all business matters to her son. She has never learned to drive and relied on friends and neighbors to transport her whenever she had to leave the farm. In the early 1960's appellee and his wife purchased the farm next to appellant's farm. A close social relationship quickly developed between the parties. They visited each other often. Appellant taught the younger couple farm-related crafts such as canning and preserving fruits and vegetables. On occasion appellee helped appellant with tasks on her farm. He also rented her barn for the storage of machinery. Despite the disparity of their ages, appellant often went out socially with appellee and his wife. They went out to dinner to celebrate appellant's and appellee's birthdays, which were only one day apart. Appellee and his wife also drove appellant to affairs she liked to attend, such as fairs, grange meetings, and VFW Auxiliary meetings.

After several years of this close relationship, on April 14, 1967, appellant signed a one page handwritten document drafted by appellee. Generally, this stated that appellant agreed to sell her farm to appellee for $15,000. Approximately one year later, appellee drove appellant to the office of his attorney, where she signed the more detailed agreement of May 22, 1968, which had been prepared by the attorney according to appellee's instruction, and which has been summarized above.

Appellant introduced the testimony of several witnesses to the effect that at or near the time of the

signing of the agreement, appellant was extremely hard of hearing. While there is some dispute as to whether appellant had a hearing aid, this testimony is significant in light of the testimony of both appellee and appellee's attorney that the agreement was not read by appellant before she signed it, but was read to her.

There is dispute as to whether appellee performed his duties under the agreement. It appears, however, that before the trial, appellant was forced to move out of the house when part of the ceiling fell, and to move in with one of her daughters.

Between the time of the signing of the agreement and the time of appellant's move to her daughter's home, appellant became more dependent on appellee. She looked to him for help in matters other than just the repair of her house. He paid the taxes on her farm, in accordance with the agreement, and he often went into town to cash checks for her at the bank. During this period, according to the testimony of appellant, she thought she was merely renting the farm to appellee just as she had previously rented it to another farmer: she continued to live in her house, as she always had; and appellee's quarterly payments of interest on the outstanding $14,500 more closely approximated payments of rent than of a purchase price.

*Frowen v. Blank, supra,* 242 Pa.Super. at 279–81, 363 A.2d at 1269–70. (footnote omitted).

In entering its findings of fact the lower court did not in any way bring into question the accuracy of this summary of the evidence. Instead, the court merely stated that, based upon the testimony by appellee and by appellee's attorney, who was present when the agreement was explained and signed, appellant's decedent "completely understood" the agreement. Finding of Fact No. 11. This finding, however, does not preclude a finding of a breach of a confidential relationship, as the lower court appears to have believed. Indeed, the question of whether someone understood a transaction is often only tangential to the question of whether a confidential relationship existed.

Our Supreme Court has defined a confidential relationship as follows:

> Confidential relation is not confined to any specific association of the parties; it is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself. It appears when the circumstances make it certain the parties do not deal on equal terms, but on the one side there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. When these circumstances appear, the law presumes the transaction void, unless the party claiming the benefit of such transaction shows affirmatively that no deception was used and the act was the intelligent and understood act of the grantor, fair, conscientious, and beyond the reach of suspicion.

*Leedom v. Palmer*, 274 Pa. 22, 25, 117 A. 410, 411 (1922). *See also Young v. Kaye*, 443 Pa. 335, 279 A.2d 759 (1971); *Brooks v. Conston*, 356 Pa. 69, 51 A.2d 684 (1947). Thus, the lower court was required to decide not simply whether appellant's decedent was competent or had the ability to comprehend, but rather whether there existed such dependence or trust that she lowered her guard and did not deal at arm's length, justifiably expecting that appellee would act fairly. Her competency and ability to understand were of course relevant to deciding whether there was dependence, but they were by no means dispositive. For example, in *Brooks v. Conston, supra,* the Supreme Court found a breach of a confidential relationship where a close family friend advised a widow to sell her chain of stores to him. The widow was not incompetent, and she understood that she was selling the stores, yet a breach of a confidential relationship was found. Similarly in *Young v. Kaye, supra,* where a businessman sold stock to his tax advisor upon the tax advisor's advice, the fact that the businessman was competent and knew what he was doing did not defeat the claim of breach of a confidential relationship.

If one examines the record in light of the foregoing cases, the following appears. Appellant's decedent was an 86 year

old woman with little education, failing eyesight, and poor hearing. She lived alone, none of her family lived close to her, and she depended, although not exclusively, upon appellee to drive her to grange meetings and other places. Appellee took appellant's decedent out on her birthday, and appellant's decedent visited appellee's home and helped with canning. She allowed appellee to rent her barn, and he helped her with her farm. Looking at appellant's decedent's situation and considering the circumstances, it is not surprising that she looked upon appellee as a very special friend, one whom she trusted. The peculiar terms of the agreement indicate that appellant's decedent was blinded by her trust of appellee. Under the agreement, she received $500 down and $725 per year for a 70 acre farm and barn. This farm had been her home for many years. The balance of the principal debt was not due until one full year after her death. Thus she herself could receive no benefit from the promise to pay the principal. The quarterly payment of $725 per year was not significant, for she could have rented the farm for a similar price; in fact she thought that she was renting the farm to appellee, and told her friends that she was renting it. Nor can the arrangement be described as one by which she intended to provide for her heirs, for if that was her intention, she could have left them the farm, which was worth more than $15,000. Nor can the arrangement be described as one based on her concern that she be cared for in her old age; the agreement did not provide that appellee would move into her house or otherwise care for her during her dying days. *Cf. Leedom v. Palmer, supra* (contract explainable as one by which decedent provided for care in his dying days).

All of the foregoing is consistent with the lower court's findings. It therefore cannot be disputed that the record shows weakness of appellant's decedent, her dependence on appellee, and an unnatural agreement. Given these facts, the conclusion follows that appellant's decedent proved that a confidential relationship existed between her and appellee.

It remains to decide what action this court should take. In order to make this decision it will be helpful to recapitu-

late: On remand the lower court was instructed to find whether a confidential relationship existed. The court found that a confidential relationship did not exist. In making this "finding" the lower court erred as a matter of law; for it arrived at the finding by asking itself only whether appellant's decedent understood the agreement, instead of by asking whether in addition she was weak and depended upon and trusted appellee. This error, however, is not insurmountable. If one considers the lower court's findings, and then goes on to consider the undisputed evidence, it becomes plain that a confidential relationship did exist. Now then, what to do?

Conceivably, we might simply reverse and order rescission of the agreement. Such an order, however, would be improper. The conclusion that a confidential relationship existed between appellant's decedent and appellee does not end one's inquiry. Its effect, rather, is to shift the burden of proof to appellee; appellee may still prevail if, although only if, he can prove that the agreement was fair. *See Young v. Kaye, supra.* I am bound to say that I should be surprised if appellee could satisfy that requirement. Nevertheless, he should have the opportunity to try.

Accordingly, I should reverse the order of the lower court and remand for further proceedings consistent with this opinion.