**GIANT FOOD STORES, INC., Plaintiff,**

v.

**MARKETPLACE COMMUNICATIONS CORP., Shelfvision, Inc., MCC of Oregon, Inc., Defendants.**

Civ. A. No. 88–1732.

United States District Court, M.D. Pennsylvania.

July 24, 1989.

Wayne F. Shade, Carlisle, Pa., for plaintiff.

Myrna G. Baskin, Stanley J. Adelman, Michael L. Daugherty, Rudnick and Wolfe, Chicago, Ill., Thomas D. Caldwell, Jr., Richard B. Swartz, Harrisburg, Pa., for defendants.

## MEMORANDUM

CALDWELL, District Judge.

Pursuant to Fed.R.Civ.P. 56, plaintiff, Giant Food Stores, Inc. (Giant), has moved for summary judgment against defendants, Marketplace Communications Corp. (Marketplace), Shelfvision, Inc. (Shelfvision), and MCC of Oregon, Inc. (MCC), in this diversity action controlled by Pennsylvania law, and removed here by the defendant, MCC.[1] Giant has sued for breach of con-

---

1. Plaintiff alleges that the defendants "are the    same corporate entity which over time changed

tract, contending that defendants have failed to pay certain minimum guarantees owed to it under the terms of an agreement under which defendants were entitled to place advertising on the shelves of plaintiff's supermarkets. MCC opposes the motion. We will examine it under the well established standard, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), bearing in mind the parties respective burdens on the motion. *See Sorba v. Pennsylvania Drilling Co.*, 821 F.2d 200 (3d Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988).

From the pleadings, affidavits and admissions on file, the following is the undisputed background to this litigation. On June 16, 1986, plaintiff and Marketplace entered into a "Standard License Agreement," permitting Marketplace to position small advertising displays on the shelves of plaintiff's supermarkets. This agreement was negotiated on behalf of Marketplace by Robert J. Ferrante, within the course and scope of his duties. (Ferrante affidavit, ¶ 3). In part, the agreement provided that Giant would receive a license fee based upon its "proportional share of thirty (30%) of the monthly net income" from the sale of the advertising space as further defined in the agreement. (second amended complaint, Exhibit A, ¶ 4.1). It also contained a clause permitting assignment by either party but requiring the written consent of the other party, "which consent [was] not [to] be unreasonably withheld." (*Id.*, ¶ 9) (brackets added). Finally, the agreement was integrated. Paragraph 13.2 provided as follows:

*Modification.* This Agreement contains the entire agreement between the parties, and unless otherwise provided in this Agreement, no modification or waiv-

er of any of the provisions, or any future representation, promise, or addition shall be binding upon the parties unless made in writing and signed by both parties.

On November 13, 1987, Shelfvision, without first receiving the written consent of Giant, assigned the agreement to Actmedia, Inc. (Actmedia), a stranger to this litigation. Thereafter, defendants made payments under the agreement until May 9, 1988. Plaintiff has received no payments from Actmedia.[2] In this action it seeks as damages the difference between payments received from defendants and the amount of certain minimum guarantees made by Ferrante at the time the agreement was executed but admittedly not included in that document.

As proof of these guarantees, plaintiff has submitted a letter, dated June 2, 1986, from Ferrante to Allan Noddle of Giant who negotiated the deal on behalf of plaintiff. The letter stated, in pertinent part, as follows:

Dear Allan:

Please excuse the delay in getting back to you.

Using 39 stores with an average weekly customer count of 11,600, your guarantee for the first two years will be as follows:

Year 1    $63,516.00
Year 2     84,689.00

(second amended complaint, Exhibit B).

Noddle responded by letter, dated June 10, 1986, which read, in relevant part:

This is a confirmation of our recently concluded negotiations in regards to the placement of Shelf Vision in Giant Food Stores. Accordingly, the following has been decided upon:

1. The using of the GFS 39 store count with an average weekly custom-

---

its name" from Marketplace to Shelfvision to MCC. (second amended complaint, ¶ 2). Defendant agrees with this allegation, (defendant's memorandum in support of motion to dismiss, footnote at p. 2), although the affidavit of Robert J. Ferrante indicates otherwise. (Ferrante affidavit, ¶ 2) (Shelfvision was purchased by Marketplace). Since MCC appears to be the only defendant in existence at the present time, we will refer only to MCC in this memorandum

unless the use of the other corporate names is preferable in context.

**2.** Defendant would say that plaintiff's refusal to accept the assignment has something to do with its failure to receive payments from Actmedia but, as shown below, whether or not the assignment should have been accepted is immaterial to defendant's liability on the guarantees.

er count of 11,600 makes the following minimum guarantees payable to Giant as follows: At the conclusion of Year 1, $63,516; at the conclusion of Year 2, $84,689.

. . . .

4. GFS will open a new store within the 60 day period in Ephrata, Pa. This store has *not been* included in any figures listed above, and you need to respond to us as to what the additional payment will be for the added store.

(second amended complaint, Exhibit E) (emphasis in original).

The June 10th letter also enclosed two copies of the Standard License Agreement which had been executed on behalf of Giant by Noddle. As noted, the agreement was dated June 16, 1986.

Plaintiff contends the parties subsequently entered into a verbal agreement concerning the new store not covered by the previous guarantees. This agreement, modifying the previous guarantees, was memorialized in a memorandum, dated July 16, 1986, authored by Noddle, and copied to Ferrante, among others. That memorandum read, in pertinent part, as follows:

As you are aware, my letter of June 10, 1986, set in motion the Shelfvision Program that is to be handled through Marketplace Communications, Corp. According to my letter, all agreements, contracts and fees have been agreed upon. In that letter I alluded to the fact that the arrangement was made for 39 stores, and the agreement did not include the new store that we have opened in Ephrata, Pa.

Accordingly, in a conversation held on July 14, 1986, with Mr. Bob Ferrante, Vice President of Marketplace Communications, the following change will be made to the agreement. (sic). *In Year 1, the guarantee goes from $63,516 to $65,145 and in Year 2, the minimum guarantee goes from $84,689 to $86,861.*

There will be no change in the up front payment of $15,000 as a good-faith contribution, which will be deducted from the minimum guarantee of the first year.

In addition, you should know that during July 21, 22, and 23, all GFS will be installed with the program. Although there will be a few Shelfvision plaques put up initially, the program will build gradually towards the end of the year and into the Spring of next year. All fees listed above are *minimum* guarantees which will be due. If there are any questions or problems with reference to the above, please feel free to contact me.

(second amended complaint, Exhibit F) (emphasis added in part).

The affidavit of Robert Ferrante confirms all of the foregoing, and in the absence of contradictory evidence from the defendant, we accept that affidavit as proof of the existence of the oral agreements concerning the minimum guarantees.[3] Specifically, Ferrante affirms that "[o]ne of the inducements offered by Marketplace ... for Plaintiff to enter into the [written agreement] was a written guarantee for minimum compensation ... under the terms of [that agreement]." (Ferrante affidavit, ¶ 5) (brackets added). This minimum compensation, set forth in his June 2nd letter to Noddle, (*Id.* ¶ 7), and confirmed in Noddle's letter to him of June 10th, constituted part of the agreement between the parties. (*Id.* ¶ 12). The minimum guarantees were not included in the formal written agreement because the guarantees "were not given to all licensors. Therefore, they were not included in the standard agreement, but the standard procedure was to memorialize them in separate letters as was done in the case of Giant Food Stores, Inc." (*Id.* ¶ 13).

Ferrante also affirmed the increase in the guarantees occasioned by the opening of the new store. As he put it:

**3.** In its answer to the second amended complaint and in response to the requests for admissions, defendant often asserts that it lacks knowledge or information concerning plaintiff's averments and so neither admits nor denies them. This answer is insufficient to carry defendant's burden on a motion for summary judgment. Defendant had the duty of marshalling evidence in support of its position. *See Celotex, supra.*

Because the minimum compensation guarantees set forth in Exhibits "B" and "E" to the Second Amended Complaint did not include the new fortieth store of Giant Food Stores, Inc., at Ephrata, Pennsylvania, Allan S. Noddle and myself agreed in a telephone conversation on July 14, 1986, that the minimum compensation guarantees under the aforesaid Exhibit "A" would be increased from $63,516.00 to $65,145.00 for the first year of the agreement and from $84,689.00 to $86,861.00 for the second year.

This oral agreement was confirmed by a written memorandum dated July 16, 1986, from Allan S. Noddle to myself and others. The copy of said memorandum which is attached to the Second Amended Complaint as Exhibit "F" is an accurate copy of the original of that memorandum.

(*Id.* ¶¶ 15, 16).

■■■ Defendant's main defense is that the written agreement is integrated, thereby precluding any attempt to prove additional terms concerning guarantees of minimum compensation or other collateral agreements.[4] The general rule in Pennsylvania is that:

Alleged prior or contemporaneous oral representations or agreements concerning subjects that are specifically dealt with in the written contract are merged in or superseded by that contract. *Bardwell v. Willis Co.*, 375 Pa. 503, 507, 100 A.2d 102, 104 (1953). The effect of an integration clause is to make the parol evidence rule particularly applicable. *National Cash Register Co. v. Modern Transfer Co., Inc.*, 224 Pa.Super. 138, 144, 302 A.2d 486, 489 (1973).

*McGuire v. Schneider, Inc.*, 368 Pa.Super. 344, 349, 534 A.2d 115, 117 (1987), *aff'd per curiam*, 519 Pa. 439, 548 A.2d 1223 (1988) (table).

But there is an exception to the parol evidence rule when the party seeking to enforce the agreement as written has made admissions that the agreement does not, in fact, constitute the entire agreement between the parties even when it contains an integration clause. *See Coal Operators Casualty Co. v. Charles T. Easterby and Co., Inc.*, 440 Pa. 218, 269 A.2d 671 (1970).

In *Coal Operators*, the appellant insurance company and the appellee insurance agency executed an agreement on January 6, 1961, authorizing the appellee, Charles T. Easterby and Co., to sell insurance policies on behalf of Coal Operators in certain areas of Pennsylvania. The agreement reserved the company's right to appoint other agents in the same territory and also contained an integration clause, providing that "its terms embody all agreements existing between [the parties] ..." *Id.* 440 Pa. at 219, 269 A.2d at 672 (brackets added). The company sued for failure of the agency to remit collected premiums and the agency counterclaimed, contending that appellant had breached an agreement to grant it an exclusive agency within its territory. In its support, appellee submitted a copy of a letter, dated November 26, 1963, and thus subsequent to the execution of the written agreement, in which the appellant's chairman wrote, "At the time this arrangement [i.e., the written agreement] was made [appellee] was appointed the *exclusive* general agent for the Counties of Philadelphia, Bucks, Chester, Delaware and Montgomery, Pennsylvania." *Id.* at 220, 269 A.2d at 672 (emphasis in original) (brackets added in part).

The trial court denied appellant's motion for judgment on the pleadings. Affirming on appeal, the supreme court noted the following exception to the parol evidence rule:

[P]arol evidence is admissible to explain and supplement a written agreement where such evidence *clearly* shows that the writing in question was not intended to and did not properly state the entire agreement between the parties. *Boyd's Estate*, [394 Pa. 225, 146 A.2d 816] supra; *Allinger v. Melvin*, 315 Pa. 298, 172 A.

---

4. The defendant is invoking the parol evidence rule which is substantive law, thereby requiring us to follow Pennsylvania law rather than the federal rules of evidence. *See Betz Laboratories, Inc. v. Hines*, 647 F.2d 402 (3d Cir.1981).

712 (1934); *Universal Film Exchanges, Inc. v. Viking Theatre Corp.*, 400 Pa. 27, 161 A.2d 610 (1960). As stated in *Boyd*: ' * * * the parol evidence rule has never barred the introduction of clear, precise and convincing evidence to show that the party who seeks to enforce the written agreement according to its tenor has admitted and acknowledged that *the agreement as written did not express what the parties intended* and that what the parties intended was omitted from the written agreement by mistake or accident.' ·(Emphasis supplied) (394 Pa. at 233, 146 A.2d [816] at 820.)

*Id.* at 440 Pa. 222–23, 269 A.2d at 673 (emphasis in original) (brackets added in part).

The supreme court did further state that the burden was on appellee to show by "clear, precise and convincing" evidence that: (1) there was an admission and (2) that the written contract was not the entire agreement between the parties, but the appellant's motion had been properly denied on the record then existing.

■ ·In the instant case, although plaintiff has not directly argued the applicability of this particular exception to the parol evidence rule, it has submitted evidence which would justify using the exception. Plaintiff has submitted a copy of a letter, dated March 25, 1988, written by Richard G. Krautsack, as president of MCC, discussing the assignment of the licensing agreement to Actmedia. Defendant has admitted the authenticity of this letter. (See Request for Admission no. 6). A portion of the letter reads as follows:

> It has come to our attention that Actmedia is now disclaiming any responsibility for ·the continuance of your guarantee. Since the guarantee was part of the contract assigned to, and assumed by, Actmedia, we are extremely distressed to see their disclaimer. Shelfvision (now known as MCC of Oregon, Inc.) has discontinued operations, and is attempting to wind up its affairs in an orderly fashion. In keeping with our excellent past relationship, *we felt you would appreciate an accurate statement of the facts regarding the assignment of your contract to Actmedia.*

(second amended complaint, Exhibit C).

Additionally, MCC itself has submitted an earlier letter from Krautsack, dated December 17, 1987, informing Giant of the then pending assignment to Actmedia, in which Krautsack again made reference to a guaranteed minimum payment. Krautsack wrote, in pertinent part, as follows:

> Pursuant to the asset sale agreement we are asking that those retailers currently participating in the Shelfvision · program agree to enter into a substitute license agreement with Actmedia. *The agreement will not contain a guaranteed minimum payment provision,* but will provide that the retailer shall receive twenty-five percent (25%) of all advertising and promotion revenues for its participating stores.

(defendant's opposition memorandum, Exhibit A) (emphasis added.)

In conjunction with Ferrante's undisputed assertion that defendant Shelfvision did, in fact, enter into the guarantee agreements with Giant, and that it was customary to have such arrangements with certain customers, we conclude that the above letters satisfy plaintiff's burden of providing not only clear, precise and convincing evidence of an admission on the part of defendant but also of the fact that the written agreement did not constitute the entire agreement between the parties. Ferrante used to work for Marketplace. It was his job to negotiate agreements like the one in the case at bar. Defendant has given us no reason to discount his testimony. The evidence is comparable to the evidence accepted by Pennsylvania courts in the past in invoking the exception to the parol evidence rule. *See In Re Boyd's Estate*, 394 Pa. 225, 146 A.2d 816 (1958). *Compare Scott v. Bryn Mawr Arms, Inc.*, 454 Pa. 304, 312 A.2d 592 (1973); *Dunn v. Orloff*, 420 Pa. 492, 218 A.2d 314 (1966). We will therefore rely upon the exception here.

In its "Statement of Contested Facts," submitted in compliance with Local Rule

401.4, defendant asserts that any letter sent to Giant was part of a mass mailing to former Shelfvision customers numbering over 7,900 stores. MCC cites in support of this assertion paragraphs D and J of the affidavit of Kenneth McNerney, MCC Vice–President, attached to defendant's opposition memorandum. MCC then argues that the reference to guarantees in the correspondence "does not necessarily reflect" an agreement to guarantee payments to Giant in particular. (defendant's statement of contested facts, ¶ 20). We reject this argument. First, the referenced paragraphs of the affidavit no where mention a mass mailing. There is such a reference in paragraph I but that paragraph limits any mass mailings to prior to January 8, 1988. It therefore does not explain away the letter of March 25, 1988, which appears to have been written for the specific purpose of helping Giant to enforce its guarantees. We also think that the reference to guarantees in the December 17th letter establishes at the very least that defendant admits that guarantees for certain customers did, in fact, exist. In conjunction with the Ferrante evidence, the letter remains probative. Second, the "statement of contested facts" is insufficient by itself to establish that "any letter" sent to Giant was part of a mass mailing since the statement is unsupported by affidavit, deposition or other proper evidentiary material.

Some of the cases also speak of an additional requirement that fraud, accident or mistake be proven before the exception can be applied. Plaintiff argues that the Ferrante testimony indicates that the minimum guarantees were left out of the written agreement by mistake or accident. We disagree. As defendant points out, the Ferrante affidavit establishes that the omission was deliberate. As a matter of practice, minimum guarantees for certain customers were left out of the standard agreement also used for others. There was no accident or mistake here.

■ Nevertheless, this conclusion does not compel us to ignore the verbal agreements for minimum guarantees. Pennsyl-

vania cases have also permitted parol evidence in the absence of fraud, accident or mistake. *See Yuhas v. Schmidt,* 434 Pa. 447, 258 A.2d 616 (1969); *Yezbak v. Croce,* 370 Pa. 263, 88 A.2d 80 (1952); *In re Boyd's Estate, supra; Ward v. Zeigler,* 285 Pa. 557, 132 A. 798 (1926); *Pacific Indemnity Co. v. McDermott Brothers Co.,* 336 F.Supp. 963 (M.D.Pa.1971), (admission by an officer of the corporation seeking to enforce the written agreement that in fact the agreement did not constitute the entire agreement between the parties is sufficient in itself to permit parol evidence) (citing *Yuhas, supra* ), *aff'd,* 475 F.2d 1395 (3d Cir.1973) (table). In *In re Boyd's Estate,* the court stated the rule simply as follows:

> Those cases hold that, "if the matter proposed to be shown by parol is the subject of a covenant in the agreement, which is complete, such evidence to alter its terms cannot be received" (*[In re] Cridge's Estate,* 289 Pa. 331, 338, 137 A. 455, 458), *unless it is admitted that the whole of the agreement is not set forth in the writing (Ward v. Zeigler,* 285 Pa. 557, 132 A. 798).

394 Pa. at 234, 146 A.2d at 821 (quoting *Allinger v. Melvin,* 315 Pa. 298, 304, 172 A. 712, 714 (1934)) (emphasis in *In re Boyd's Estate* ) (brackets in original).

In *Yezbak,* the court permitted parol evidence without any reference to fraud, accident or mistake, setting forth the rule in the context of that case as follows:

> The admission of *Yezbak* of the existence of some sort of an oral agreement pursuant to which $3,025 was in fact credited to Croce excludes application of the rule that parol evidence may not modify a written agreement. The parol evidence rule is based on the assumption that the written contract contains the full and exact agreement of the parties but where admittedly it does not, the reason for the rule ceases. *Ward v. Zeigler,* 285 Pa. 557, 132 A. 798; *Newland v. Lehigh Valley Railroad Company,* 315 Pa. 193, 173 A. 822.
>
> The fact that the Croces assert that the oral contract provided for the sale of

scrap through Mr. Yezbak on their behalf at current market prices and the fact that Yezbak contends he agreed to pay only a fixed price is irrelevant in deciding the issue before us because once it is conceded that the writing does not fully state the entire agreement between the parties upon any given point, either party has the right to show what the true facts were regarding the matter thus resting in parol. *Ward v. Zeigler,* supra; *Kerr v. McClure,* 266 Pa. 103, 109 A. 600.

370 Pa. at 266–67, 88 A.2d at 81–82.

Defendant also glibly argues, without citation to any authority, and as if it were hornbook law, that the minimum guarantees are unenforceable under the "Statute of Frauds" since they are incapable of being performed within one year. Cursory research into Pennsylvania law reveals the baselessness of this position. Pennsylvania's statute of frauds is found at 33 P.S. §§ 1–8 (Purdon 1967). "Unlike many jurisdictions, the Pennsylvania Statute of Frauds does not include a provision for agreements that cannot be performed within one year, the principle obstacle confronting such agreements." *Kohr v. Kohr,* 271 Pa.Super. 321, 329 n. 3, 413 A.2d 687, 691, n. 3 (1979) (citations omitted). We therefore reject this argument.

Defendant also contends that summary judgment is foreclosed because there is a factual dispute concerning the reasonableness of plaintiff's refusal to accept assignment of the agreement to Actmedia. Even if this is true, it is not relevant to defendant's liability under the agreement.

It is basic contract law that an initially obligated party cannot delegate his responsibility by agreement with a third person. "Neither the delegation of performance by an obligor, nor a contract with the obligor by the person to whom the performance is delegated to assume the obligor's duty, extinguishes it or pre-

vents recovery of damages from him if the duty is not performed." Restatement of Contracts § 160(4) (1932). *Cf. Saxe v. Feinstein,* 366 Pa. 473, 77 A.2d 419 (1951); *Beach v. Morris,* 12 Serg. & R. 16 (Pa.1824); 3 S. Williston, *A Treatise on the Law of Contracts* § 411 (3d ed. 1960). A party with an original obligation to another cannot divest himself of liability to that party merely by contracting with a third party to assume that liability.

*Husak v. Berkel, Inc.,* 234 Pa.Super. 452, 462, 341 A.2d 174, 179 (1975) (footnote omitted); *See also McAlpine v. AAMCO Automatic Transmissions, Inc.,* 461 F.Supp. 1232 (E.D.Mich.1978) (applying Pennsylvania law).

Defendant has admitted that plaintiff's calculation of the unpaid amount of the guarantees is correct, although it has argued that it is not legally liable for them. Accordingly, we need only enter judgment for the amount demanded.[5]

We will issue an appropriate order.

---

**5.** Subsequent to the briefing of the motion for summary judgment, defendant filed a motion to amend its pleadings to assert the defense of plaintiff's failure to mitigate damages. We will deny this motion. The summary judgment motion was argued and considered upon defendant's representation that it did not dispute the calculation of damages. We are also on the eve of trial, and the motion to amend is too late, coming after the deadline set in our scheduling order for such motions.